130 F.3d 187
 WOMEN'S MEDICAL PROFESSIONAL CORPORATION, Martin Haskell,
M.D., Plaintiffs-Appellees,
v.
George VOINOVICH, Governor, State of Ohio, Betty D.
Montgomery, Ohio Attorney General,
Defendants-Appellants (96-3157),
Mathias H. Heck, Jr., Montgomery County Prosecuting
Attorney, Defendant-Appellant (96-3159).
 Nos. 96-3157, 96-3159.
 United States Court of Appeals,
Sixth Circuit.
 Argued May 2, 1997.
Decided Nov. 18, 1997.
 
 David C. Greer (briefed), Bieser, Greer & Landis, Dayton, Ohio, Alphonse A. Gerhardstein (argued and briefed), Sarah W. Poston (briefed), Laufman, Rauh & Gerhardstein, Cincinnati, Ohio, Kathryn Kolbert (briefed), Center For Reproductive Law & Policy, New York City, for Women's Medical Professional Corp. in No. 96-3157.
 David C. Greer, Bieser, Greer & Landis, Dayton, Ohio, Alphonse A. Gerhardstein (argued), Sarah W. Poston, Laufman, Rauh & Gerhardstein, Cincinnati, Ohio, Kathryn Kolbert, Center For Reproductive Law & Policy, New York City, for Women's Medical Professional Corp. in No. 96-3159.
 David C. Greer, Bieser, Greer & Landis, Dayton, Ohio, Alphonse A. Gerhardstein, Sarah W. Poston, Laufman, Rauh & Gerhardstein, Cincinnati, Ohio, Kathryn Kolbert, Center For Reproductive Law & Policy, New York City, for Martin Haskell, M.D. in Nos. 96-3157 and 96-3159.
 Elizabeth A. Scott (briefed), Diane R. Richards (argued and briefed), Office of the Attorney General of Ohio, Columbus, Ohio, for George Voinovich and Betty Montgomery in No. 96-3157.
 Elissa D. Cohen (argued and briefed), Richard W. Divine, Office of the Prosecuting Attorney for the County of Montgomery, Dayton, Ohio, for Mathias H. Heck, Jr. in No. 96-3159.
 James Bopp, Jr. (briefed), Bopp, Coleson & Bostrom, Terre Haute, Indiana, for American Association of Pro Life Obstetricians & Gynecologists.
 Robert R. Melnick (briefed), Rutherford Institute, Youngstown, Ohio, for Rutherford Institute.
 David J. Young (briefed), Squire, Sanders & Dempsey, Columbus, Ohio, for States of Nebraska, Alabama, California, Illinois, Mississippi and South Carolina and the Commonwealth of Virginia in No. 96-3157.
 David J. Young, Squire, Sanders & Dempsey, Columbus, Ohio, for States of Nebraska, Alabama, California, Illinois, Mississippi and South Carolina and the Commonwealth of Virginia in No. 96-3159.
 Paul Benjamin Linton (briefed), Americans United For Life, Chicago, Illinois, for Members of the Ohio General Assembly.
 Nancy Northup (briefed), American Civil Liberties Union Foundation, New York City, Joan M. Englund (briefed), ACLU of Ohio Foundation, Inc., Cleveland, Ohio, for American College of Obstetricians and Gynecologists in No. 96-3157.
 Nancy Northup, American Civil Liberties Union Foundation, New York City, Joan M. Englund (briefed), ACLU of Ohio Foundation, Inc., Cleveland, Ohio, for American College of Obstetricians and Gynecologists in No. 96-3159.
 Lara E. Bowles (briefed), Arnold & Porter, Karen R. Guss (briefed), Marcy J. Wilder (briefed), National Abortion and Reproductive Rights Action League, Washington, DC, for National Abortion and Reproductive Rights Action League Foundation.
 Before: BROWN, KENNEDY, and BOGGS, Circuit Judges.
 KENNEDY, J., delivered the opinion of the court, in which BROWN, J., joined. BOGGS, J. (pp. 211-19), delivered a separate dissenting opinion.
 OPINION
 KENNEDY, Circuit Judge.
 
 
 1
 This case involves a facial challenge to the constitutionality of House Bill 135 ("Act"), which was enacted by the Ohio General Assembly on August 16, 1995, and was to have gone into effect on November 14, 1995. The District Court held unconstitutional the three major portions of the Act: (1) the ban on the use of the "dilation and extraction" (D & X) abortion procedure; (2) the ban on the performance of post-viability abortions; and (3) the viability testing requirement. The District Court further held that no other part of the Act was either constitutional or severable. It therefore enjoined enforcement of the entire Act. For the following reasons, we AFFIRM.
 
 I. Facts
 A. House Bill 135
 
 2
 The Act creates two separate bans as well as separate requirements with regard to post-viability abortions. First, the Act bans the use of the D & X procedure in all abortions, i.e. pre- and post-viability: "No person shall knowingly perform or attempt to perform a dilation and extraction procedure upon a pregnant woman." OHIO REV.CODE ANN. § 2919.15(B) (Anderson 1996). The D & X procedure is defined as:
 
 
 3
 [T]he termination of a human pregnancy by purposely inserting a suction device into the skull of a fetus to remove the brain. "Dilation and extraction procedure" does not include either the suction curettage procedure of abortion or the suction aspiration procedure of abortion.
 
 
 4
 Id. § 2919.15(A). Physicians who are criminally prosecuted or sued civilly for violating this ban may assert, as an affirmative defense, that all other available abortion procedures would have posed a greater risk to the health of the pregnant woman. Id. § 2919.15(C)(1) (governing criminal actions); id. § 2307.51(C) (Anderson Supp.1995) (governing civil actions). In a criminal action, if the physician establishes a prima facie case in support of the affirmative defense, the prosecutor must prove beyond a reasonable doubt that at least one other available abortion procedure would not have posed a greater risk to the health of the pregnant woman than the risk posed by the D & X procedure. Id. § 2919.15(C)(2).
 
 
 5
 Second, the Act provides that "[n]o person shall purposely perform or induce or attempt to perform or induce an abortion upon a pregnant woman if the unborn human is viable," except in the following two circumstances:
 
 
 6
 (1) The abortion is performed or induced or attempted to be performed or induced by a physician, and that physician determines, in good faith and in the exercise of reasonable medical judgment, that the abortion is necessary to prevent the death of the pregnant woman or a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman.
 
 
 7
 (2) The abortion is performed or induced or attempted to be performed or induced by a physician and that physician determines, in good faith and in the exercise of reasonable medical judgment, after making a determination relative to the viability of the unborn human in conformity with division (A) of section 2919.18 of the Revised Code, that the unborn human is not viable.
 
 
 8
 Id. § 2919.17(A). For purposes of the post-viability ban, any fetus of at least twenty-four weeks gestational age is rebuttably presumed to be viable. Id. § 2919.17(C).[1]
 
 
 9
 Section 2919.18(A), the viability testing provision, requires that no abortion shall be performed or attempted to be performed "after the beginning of [a pregnant woman's] twenty-second week of pregnancy" unless the physician determines "in good faith and in the exercise of reasonable medical judgment, that the unborn human is not viable, and the physician makes that determination after performing a medical examination of the pregnant woman and after performing or causing the performing" of tests that a "reasonable physician" would make to determine viability. Id. § 2919.18(A)(1). The viability testing provision need not be complied with if a medical emergency exists.[2] Id. § 2919.18(A)(3).
 
 
 10
 Finally, any physician intending to perform a post-viability abortion, having determined that an abortion is "necessary", must meet several requirements: (1) the physician must certify the necessity of the abortion in writing; (2) a second physician must certify the necessity of the abortion in writing, after reviewing the patient's medical records and tests; (3) the abortion must be performed in a health care facility which has access to neonatal services for premature infants; (4) the physician must choose the abortion method which provides the best opportunity for the fetus to survive, unless it would pose a significantly greater risk of death to the pregnant woman, or a serious risk of substantial and irreversible impairment to a major bodily function; and (5) a second physician must be present at the abortion to care for the unborn human. Id. § 2919.17(B)(1). The physician need not comply with these conditions if the physician determines that a medical emergency exists. Id. § 2919.17(B)(2).
 
 
 11
 The Act creates civil and criminal liability for violations of the D & X ban and the post-viability ban, and criminal liability for violations of the viability testing requirement. Violation of either the D & X ban or the post-viability ban is a fourth degree felony. Id. §§ 2919.15(D), 2919.17(D). Violation of the viability testing requirement is a fourth degree misdemeanor. Id. § 2919.18(b). A patient upon whom either a D & X or a post-viability abortion is performed or attempted to be performed is not criminally liable. Id. §§ 2919.15(E), 2919.17(E). She may, however, sue within one year of a violation of either the D & X ban or the post-viability ban for compensatory, punitive, and exemplary damages, as well as for costs and attorney's fees. Id. §§ 2307.51(B), 2307.52(B). Derivative claims for relief may also be brought. Id. § 2305.11(D)(3) & (7).
 
 B. Procedural History
 
 12
 Plaintiff Women's Medical Professional Corporation (WMPC) operates clinics and provides abortion services in Montgomery, Hamilton, and Summit Counties, Ohio. Plaintiff Martin Haskell, M.D., is a doctor affiliated with plaintiff WMPC. He formerly performed abortions after the twenty-fourth week of pregnancy, but no longer does so. He uses the D & X procedure for abortions during the twenty-first to twenty-fourth weeks of gestation.[3] On October 27, 1995, plaintiffs filed suit for declaratory and injunctive relief from all provisions of the Act, both on their own behalf and on behalf of their patients. Plaintiffs allege that the Act imposes an undue burden on the rights of pregnant women to choose an abortion and, further, that the Act's provisions are unconstitutionally vague. They seek to enjoin enforcement of the Act as a violation of their rights to privacy, liberty, and due process, as guaranteed by the Fourteenth Amendment to the United States Constitution.
 
 
 13
 After two days of testimony, the District Court granted a ten-day Temporary Restraining Order (TRO) on November 13, 1995. This TRO was extended for an additional ten days and was set to expire on December 13. In the interim, the court conducted four additional days of hearings on the constitutionality of the Act. On December 13, the District Court issued a preliminary injunction, concluding that plaintiffs had demonstrated a substantial likelihood of success of showing that the entire Act was unconstitutional and that the issuance of a preliminary injunction was otherwise appropriate. See Women's Med. Prof'l Corp. v. Voinovich, 911 F.Supp. 1051, 1092-94 (S.D.Ohio 1995). Subsequently, the parties stipulated to the consolidation of the preliminary injunction hearings with a trial upon the merits. Thus, on January 12, 1996, the preliminary injunction was converted into a permanent injunction. The District Court did not issue another opinion. Appellants filed a timely notice of appeal.
 
 II. Discussion
 A. Standard of Review
 
 14
 This court reviews questions of law de novo. Kellogg v. Shoemaker, 46 F.3d 503, 506 (6th Cir.), cert. denied, 516 U.S. 839, 116 S. Ct. 120, 133 L.Ed.2d 70, and cert. denied, 516 U.S. 907, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995). While we normally review questions of fact for clear error, see FED.R.CIV.P. 52, an appellate court is to conduct an independent review of the record when constitutional facts are at issue. See Jacobellis v. Ohio, 378 U.S. 184, 190 & n. 6, 84 S.Ct. 1676, 1679 & n. 6, 12 L.Ed.2d 793 (1964).
 
 B. Legal Standards
 
 15
 Plaintiffs essentially challenge the constitutionality of the Act on two grounds. First, they assert that the Act's provisions are unconstitutional under Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), because they impose undue burdens on a woman's right to choose an abortion or they jeopardize the pregnant woman's health. Second, they assert that a number of the Act's provisions are unconstitutionally vague. We first address the legal standards governing these claims.
 
 
 16
 1. Substantive Law Governing Abortion Regulations
 
 
 17
 In Roe v. Wade, 410 U.S. 113, 152-66, 93 S.Ct. 705, 726-33, 35 L.Ed.2d 147 (1973), the Supreme Court held that a pregnant woman has a constitutional right, under the Due Process Clause of the Fourteenth Amendment, to choose to terminate her pregnancy before viability. In Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 879, 112 S.Ct. 2791, 2821-22, 120 L.Ed.2d 674 (1992), the Court reaffirmed this "central holding" of Roe, which mandates that a State may not prohibit a woman from making the ultimate decision to terminate her pregnancy prior to viability. However, a plurality of the Casey Court discarded the trimester framework of Roe, explaining that the State has a profound interest in potential life throughout pregnancy. See id. at 872-76, 112 S.Ct. at 2817-20. The plurality then articulated the "undue burden" standard as the appropriate means of reconciling the State's interests with the woman's constitutionally protected liberty. See id. at 876, 112 S.Ct. at 2820. They explained that "[a] finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." Id. at 877, 112 S.Ct. at 2820. States therefore can regulate abortion pre-viability as long as such regulation does not constitute an undue burden on a woman's right to choose to have an abortion. Finally, the Casey Court reaffirmed Roe 's holding that " 'subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.' " Id. at 879, 112 S.Ct. at 2821 (quoting Roe, 410 U.S. at 164-65, 93 S.Ct. at 732).[4]
 
 
 18
 Since Casey, a number of state legislatures have enacted laws regulating pre-viability abortions, and federal courts have considered the constitutionality of some of these regulations. See, e.g., Planned Parenthood, Sioux Falls Clinic v. Miller, 63 F.3d 1452 (8th Cir.1995) (holding unconstitutional parental notification provisions, criminal-penalty provisions, and civil-damages provisions, and holding constitutional mandatory information requirements), cert. denied sub nom. Janklow v. Planned Parenthood, Sioux Falls Clinic, 517 U.S. 1174, 116 S.Ct. 1582, 134 L.Ed.2d 679 (1996); Fargo Women's Health Org. v. Schafer, 18 F.3d 526 (8th Cir.1994) (holding constitutional informed consent requirements, a mandatory information requirement, a twenty-four hour waiting period, and a medical emergency definition). Only one court has addressed the constitutionality of an abortion law that banned abortions post-viability, but that court applied Casey 's undue burden standard. See Jane L. v. Bangerter, 102 F.3d 1112, 1115-18 (10th Cir.1996) (holding that a ban on abortions after twenty-weeks gestational age would pose an undue burden, because, by irrebuttably presuming viability at twenty weeks, the law prohibits the abortion of fetuses that may be nonviable), cert. denied sub nom. Leavitt v. Jane L., --- U.S. ----, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997). While the District Court in this case and the Eastern District of Michigan, in Evans v. Kelley, 977 F.Supp. 1283 (E.D.Mich.1997), have addressed the constitutionality of bans on the D & X procedure, we are the first United States Court of Appeals to consider this issue. We therefore venture into a relatively novel area of abortion law with this case.
 
 
 19
 2. Standard for Reviewing Facial Challenges to Abortion Law
 
 
 20
 The first issue disputed on appeal is the proper standard for reviewing challenges to the facial validity of laws regulating abortion. Appellants argue that the test set out in United States v. Salerno, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), applies, while plaintiffs maintain that the Supreme Court's analysis in Casey displaces Salerno in the abortion context. This is a question of first impression for this circuit. We join the majority of courts that have considered this issue and conclude that Salerno is not applicable to facial challenges to abortion regulations.
 
 
 21
 A court may hold a statute unconstitutional either because it is invalid "on its face" or because it is unconstitutional "as applied" to a particular set of circumstances. Each holding carries an important difference in terms of outcome: If a statute is unconstitutional as applied, the State may continue to enforce the statute in different circumstances where it is not unconstitutional, but if a statute is unconstitutional on its face, the State may not enforce the statute under any circumstances. Traditionally, a plaintiff's burden in an as-applied challenge is different from that in a facial challenge. In an as-applied challenge, "the plaintiff contends that application of the statute in the particular context in which he has acted, or in which he proposes to act, would be unconstitutional." Ada v. Guam Soc'y of Obstetricians and Gynecologists, 506 U.S. 1011, 1012, 113 S.Ct. 633, 634, 121 L.Ed.2d 564 (1992) (Scalia, J., dissenting), denying cert. to 962 F.2d 1366 (9th Cir.1992). Therefore, the constitutional inquiry in an as-applied challenge is limited to the plaintiff's particular situation. In comparison, the Court explained in Salerno that[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid. The fact that [an Act] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an "overbreadth" doctrine outside the limited context of the First Amendment.
 
 
 22
 481 U.S. at 745, 107 S.Ct. at 2100. In other words, a facial challenge to a statute should fail if the statute has a constitutional application. The Supreme Court applied the Salerno "no set of circumstances" test in a couple of pre-Casey cases involving state abortion regulations. See Rust v. Sullivan, 500 U.S. 173, 183, 111 S.Ct. 1759, 1767, 114 L.Ed.2d 233 (1991); Ohio v. Akron Ctr. for Reprod. Health, 497 U.S. 502, 514, 110 S.Ct. 2972, 2980-81, 111 L.Ed.2d 405 (1990); see also Webster v. Reproductive Health Servs., 492 U.S. 490, 524, 109 S.Ct. 3040, 3059-60, 106 L.Ed.2d 410 (1989) (O'Connor, J., concurring).
 
 
 23
 In Casey, however, the Court stated that an abortion law is unconstitutional on its face if "in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." 505 U.S. at 895, 112 S.Ct. at 2830. This analysis is inconsistent with the rule set forth in Salerno. Under Salerno, no factual showing of unconstitutional applications can render a law unconstitutional if it has any constitutional applications. Under Casey, a factual showing of unconstitutional applications, in a substantial percentage of the cases where a law applies, can render a law unconstitutional even if the law has constitutional applications.
 
 
 24
 Moreover, the Casey Court's evaluation of the Pennsylvania statute at issue demonstrates the change Casey wrought. For example, rather than rejecting plaintiffs' facial challenge to Pennsylvania's spousal notification provision on the ground that they had not established that "no set of circumstances exists under which the Act would be valid," Salerno, 481 U.S. at 745, 107 S.Ct. at 2100, the Court struck down the provision because the record showed that "in a large fraction of the cases in which [the provision] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion," 505 U.S. at 895, 112 S.Ct. at 2830. See Casey, 505 U.S. at 887-95, 112 S.Ct. at 2825-30. The State of Pennsylvania argued that the provision imposed almost no burden for the vast majority of women seeking abortion, and the Court seemed to accept the State's claim that the provision in fact affected only one percent of women. Id. at 894, 112 S.Ct. at 2829. But the Court explained that "[t]he proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." Id.
 
 
 25
 Although Casey does not expressly purport to overrule Salerno, in effect it does. Indeed, the Chief Justice recognized as much in his dissent. See id. at 972, 112 S.Ct. at 2870 (Rehnquist, C.J., dissenting in part) ("[B]ecause this is a facial challenge to the Act, it is insufficient for petitioners to show that the [spousal] notification provision 'might operate unconstitutionally under some conceivable set of circumstances.' United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987)."). Since Casey, most courts have held that Casey displaces Salerno in the abortion context. See Jane L. v. Bangerter, 102 F.3d 1112, 1116 (10th Cir.1996) (noting the difference between the Salerno and Casey standards and holding that the Casey standard applies to facial challenges to abortion regulations) cert. denied sub nom. Leavitt v. Jane L., --- U.S. ----, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997); Planned Parenthood, Sioux Falls Clinic v. Miller, 63 F.3d 1452, 1456-58 (8th Cir.1995) (holding that Casey effectively overruled Salerno for facial challenges to abortion statutes), cert. denied sub nom. Janklow v. Planned Parenthood, Sioux Falls Clinic, 517 U.S. 1174, 116 S.Ct. 1582, 134 L.Ed.2d 679 (1996); Casey v. Planned Parenthood of Southeastern Pennsylvania, 14 F.3d 848, 863 n. 21 (3d Cir.) (stating in dicta that "we agree with the Commonwealth and the clinics that the Court has, in this case, set a new standard for facial challenges to pre-viability abortion laws," by requiring "only that a plaintiff show an abortion regulation would be an undue burden 'in a large faction of the cases' "), stay denied, 510 U.S. 1309, 114 S.Ct. 909, 127 L.Ed.2d 352 (1994); A Woman's Choice-East Side Women's Clinic v. Newman, 904 F.Supp. 1434, 1447-48 (S.D.Ind.1995) ("[L]ike the Third and Eighth Circuits, this court believes that Casey effectively displaced Salerno 's application to abortion laws."), certifying questions to 671 N.E.2d 104 (Ind.1996); Utah Women's Clinic, Inc. v. Leavitt, 844 F.Supp. 1482, 1489 (D.Utah 1994) (suggesting a hybrid standard by holding that "to bring a facial challenge in good faith, one must reasonably believe that the statute is incapable of being applied constitutionally [i.e., Salerno ] in a large fraction of the cases in which it is relevant [i.e., Casey ]"), appeal dismissed in part and judgment rev'd in part on other grounds, 75 F.3d 564 (10th Cir.1995), cert. denied, 518 U.S. 1019, 116 S.Ct. 2551, 135 L.Ed.2d 1070 (1996); see also Michael C. Dorf, Facial Challenges to State and Federal Statutes, 46 STAN. L.REV. 235, 276 (1994) (arguing that the Casey Court applied a "substantial overbreadth" test, which conflicts with Salerno but is consistent with other substantive due process decisions). Only the Fifth Circuit continues to apply Salerno in cases involving facial challenges to abortion regulations. See Barnes v. Moore, 970 F.2d 12, 14 n. 2 (5th Cir.) (stating that "[t]he Casey joint opinion may have applied a somewhat different standard in striking down the spousal notification provision.... Nevertheless, we do not interpret Casey as having overruled, sub silentio, longstanding Supreme Court precedent governing challenges to the facial constitutionality of statutes"), cert. denied, 506 U.S. 1021, 113 S.Ct. 656, 121 L.Ed.2d 582 (1992); accord Causeway Med. Suite v. Ieyoub, 109 F.3d 1096, 1102-04 (5th Cir.1997).
 
 
 26
 The Supreme Court itself appears to be split on this question regarding Salerno 's continued vitality in cases involving abortion regulations. Although the Court has yet to address the issue in a decision, members of the Court have offered their opinions in memoranda denying petitions for certiorari and applications for stays and injunctions pending appeal. Justice O'Connor, joined by Justice Souter, has explained the Casey decision as follows:
 
 
 27
 In striking down Pennsylvania's spousal-notice provision, we did not require petitioners to show that the provision would be invalid in all circumstances. Rather, we made clear that a law restricting abortions constitutes an undue burden, and hence is invalid, if, "in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion."
 
 
 28
 Fargo Women's Health Org. v. Schafer, 507 U.S. 1013, 1014, 113 S.Ct. 1668, 1669, 123 L.Ed.2d 285 (1993) (O'Connor, J., concurring in denial of application for stay and injunction pending appeal) (quoting Casey, 505 U.S. at 895, 112 S.Ct. at 2830). In contrast, Justice Scalia, joined by Chief Justice Rehnquist and Justice White, has stated that the only exception to the Salerno rule is for First Amendment cases, and "[t]he Court did not purport to change this well-established rule [in Casey ]." Ada v. Guam Soc'y of Obstetricians and Gynecologists, 506 U.S. 1011, 1012-13, 113 S.Ct. 633, 634, 121 L.Ed.2d 564 (1992) (Scalia, J., dissenting), denying cert. to 962 F.2d 1366 (9th Cir.1992). Additionally, Justice Stevens has criticized the Salerno rule as "rhetorical flourish ... unsupported by citation or precedent." Janklow v. Planned Parenthood, Sioux Falls Clinic, 517 U.S. 1174, ----, 116 S.Ct. 1582, 1583, 134 L.Ed.2d 679 (1996) (Stevens, J., mem.), denying cert. to Planned Parenthood, Sioux Falls Clinic v. Miller, 63 F.3d 1452 (8th Cir.1995). Justice Stevens cited Casey and other non-abortion cases as support for his proposition that "Salerno 's rigid and unwise dictum has been properly ignored in subsequent cases." Id. at ---- & n. 1, 116 S.Ct. at 1583 & n. 1. Justice Scalia, joined by Chief Justice Rehnquist and Justice Thomas, dissented from the denial of certiorari in Janklow, stating that the question whether Salerno still applies in the abortion context is a "question that virtually cries out for our review." Id. at ----, 116 S.Ct. at 1584 (Scalia, J., dissenting).
 
 
 29
 We hold that this circuit should "follow what the Supreme Court actually did--rather than what it failed to say--and apply the undue-burden test," Planned Parenthood, Sioux Falls Clinic, 63 F.3d at 1458, without regard to Salerno. Therefore, in deciding whether the Act's regulation of pre-viability abortions, specifically the D & X ban, violates the Constitution, we must consider the record and determine whether "in a large fraction of the cases in which [the ban] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion," Casey, 505 U.S. at 895, 112 S.Ct. at 2830. Even if the Act has some constitutional applications, we must strike it down if it is unconstitutional under Casey.
 
 
 30
 The courts that have considered Salerno 's applicability since Casey have all been faced with what they construed as challenges to pre-viability abortion measures. No court has considered whether Casey displaces Salerno in cases involving facial challenges to post-viability abortion regulations.[5] As the District Court stated, Casey is not dispositive, because it "does not evaluate whether a law restricting access to post-viability abortions is invalid simply because it may jeopardize the life or health of a few (or many) pregnant women who need such an abortion." 911 F.Supp. at 1062. We can see no reason to apply a different standard for pre- and post-viability abortion. We conclude that Casey 's analysis should be extended to post-viability abortion regulations.
 
 
 31
 The Casey Court expressly reaffirmed Roe 's holding that throughout a woman's pregnancy a State cannot interfere with a woman's choice to have an abortion if continuing her pregnancy would constitute a threat to her health. See Casey, 505 U.S. at 880, 112 S.Ct. at 2822. Significantly, the Casey Court cited Harris v. McRae, 448 U.S. 297, 316, 100 S.Ct. 2671, 2687, 65 L.Ed.2d 784 (1980), in which the Court stated:
 
 
 32
 Because even the compelling interest of the State in protecting potential life after fetal viability was held [in Roe ] to be insufficient to outweigh a woman's decision to protect her life or health, it could be argued that the freedom of a woman to decide whether to terminate her pregnancy for health reasons does in fact lie at the core of the constitutional liberty identified in [Roe].
 
 
 33
 See Casey, 505 U.S. at 880, 112 S.Ct. at 2822 (emphasis added). Given the predominance of a woman's interest in her own life and health, we believe the Casey Court's "large fraction of the relevant population" test should be followed when considering facial challenges to post-viability abortion regulations. As the District Court pointed out:
 
 
 34
 [B]ecause the Supreme Court signalled in Casey that an unconstitutional infringement of the liberty interests of some, but not all, pregnant women, is sufficient to justify application of a lesser standard where a pre-viability abortion is concerned, there is no reason why the Court would not similarly apply a lesser standard where a law threatens to deprive some, but not all, pregnant women of their greater constitutional interest in their own life and health.
 
 
 35
 911 F.Supp. at 1062. Even though the State has a right to ban post-viability abortion, and therefore applications of the ban will be constitutional where a woman's health and life are not at risk, a post-viability abortion regulation which threatens the life or health of even a few pregnant women should be deemed unconstitutional. "The proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." Casey, 505 U.S. at 894, 112 S.Ct. at 2829. The State's regulation of post-viability abortions is most relevant to women seeking legal post-viability abortions due to medical necessity or medical emergency. If the State's ban on post-viability abortions does not allow those women to choose to have an abortion in such circumstances, thereby infringing upon their right to protect their life and health, the ban should be held unconstitutional. A woman should not have to wait until she has been unconstitutionally deprived of her life or health before she may challenge a post-viability abortion regulation. We will therefore follow Casey in considering the constitutionality of the pre-viability and post-viability abortion regulations.
 
 3. Standard for Vagueness Challenges
 
 36
 Plaintiffs challenge the D & X procedure, the medical emergency exception, and the medical necessity provision as unconstitutionally vague. The Supreme Court has stated general standards for evaluating whether a statute is unconstitutionally vague:
 
 
 37
 It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.
 
 
 38
 Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972) (footnotes omitted). In addition, "[t]he requirement that government articulate its aims with a reasonable degree of clarity ensures that state power will be exercised only on behalf of policies reflecting an authoritative choice among competing social values ... and permits meaningful judicial review." Roberts v. United States Jaycees, 468 U.S. 609, 629, 104 S.Ct. 3244, 3256, 82 L.Ed.2d 462 (1984). Yet, the Court also has said that a statute is void only if it is so vague that "no standard of conduct is specified at all." Coates v. City of Cincinnati, 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971).
 
 
 39
 This court has explained that "[a]t times the Court has suggested that a statute that does not run the risk of chilling constitutional freedoms is void on its face only if it is impermissibly vague in all its applications, but at other times it has suggested that a criminal statute may be facially invalid even if it has some conceivable application." Springfield Armory, Inc. v. City of Columbus, 29 F.3d 250, 251-52 (6th Cir.1994) (citing Kolender v. Lawson, 461 U.S. 352, 358-59 n. 8, 103 S.Ct. 1855, 1859 n. 8, 75 L.Ed.2d 903 (1983); Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495, 102 S.Ct. 1186, 1191-92, 71 L.Ed.2d 362 (1982); and Colautti v. Franklin, 439 U.S. 379, 394-401, 99 S.Ct. 675, 685-89, 58 L.Ed.2d 596 (1979)). We therefore must keep in mind that "[t]he degree of vagueness that the Constitution tolerates--as well as the relative importance of fair notice and fair enforcement--depends in part on the nature of the enactment." Hoffman Estates, 455 U.S. at 498, 102 S.Ct. at 1193. When criminal penalties are at stake, a relatively strict test is warranted. Id. at 498-99, 102 S.Ct. at 1193-94; Springfield Armory, 29 F.3d at 252. "Finally, perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." Hoffman Estates, 455 U.S. at 499, 102 S.Ct. at 1193.
 
 C. D & X Ban
 1. Introduction
 
 40
 The District Court found the provisions relating to the Act's ban on the performance or attempted performance of any abortion using the D & X procedure unconstitutional on several bases. First, it found that the Act's definition of the D & X procedure is unconstitutionally vague, because it could be construed as including within its ambit the more widespread abortion procedure known as dilation and evacuation (D & E) and, therefore, it does not provide physicians fair warning as to what conduct is permitted. See 911 F.Supp. at 1063-67. Second, the court found that the D & X procedure is potentially safer than other available abortion procedures; therefore, it held that under Planned Parenthood of Central Missouri v. Danforth, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), the State could not ban the procedure and that under Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674, such a ban would be an undue burden because it would force women to undergo riskier and more deleterious abortion procedures. See 911 F.Supp. at 1067-71. Finally, the District Court considered the State's asserted interest in banning the D & X procedure and determined that, although the State's purpose was legitimate, the ban did not serve that purpose.[6] Id. at 1071-75. We agree with the District Court that the D & X ban is unconstitutional, but through somewhat different reasoning.
 
 
 41
 2. The Definition of the Prohibited Procedure
 
 
 42
 The Act defines the D & X procedure as "the termination of a human pregnancy by purposely inserting a suction device into the skull of a fetus to remove the brain." OHIO REV.CODE ANN. § 2919.15(A). The definition further provides that the D & X procedure "does not include either the suction curettage procedure of abortion or the suction aspiration procedure of abortion." Id. We agree with the District Court that the record shows that the Act's definition of the banned procedure encompasses the D & E procedure. Although the District Court's opinion details the evidence submitted with regard to a number of different abortion procedures, we believe it would be useful to summarize how and when the three procedures implicated by the Act are performed, in order to demonstrate the Act's failure to adequately distinguish between the D & E and D & X procedures.
 
 
 43
 During the first trimester, the most common method of abortion is the suction curettage, or suction aspiration, procedure.[7] When performing the suction curettage procedure, the physician mechanically dilates the pregnant woman's cervix by means of metal rods, inserts a vacuum apparatus into the uterus, and removes the fetal matter by means of negative suction. Suction curettage can sometimes be performed up to the fifteenth week of pregnancy.
 
 
 44
 The most common method of abortion in the second trimester is the D & E procedure. The suction curettage procedure alone is no longer feasible at this point in a woman's pregnancy, because the fetus is too large to remove by use of suction only. In the D & E procedure, the physician inserts laminaria into the pregnant woman's cervix in order to dilate the cervix; laminaria takes about one to two days to accomplish dilation. Once the woman's cervix is dilated, a suction curette of larger diameter than that used in the suction curettage procedure is placed through the cervix and into the uterus. With the suction curette, the physician can remove some or all of the fetal tissue. However, the torso and the head of the fetus often cannot be removed using the suction curette. Therefore, the D & E procedure typically entails dismembering the fetus, beginning with the extremities, by means of suction curettage and forceps. The most difficult part of the D & E procedure is the removal of the fetal head from the woman's uterus, because it is often too large to fit through the partially dilated cervix. Physicians have developed different methods of removing the head. The evidence shows that some physicians compress the head by using suction to remove the intracranial contents. See Nov. 13, 1995 Hearing Transcript at 269-70 (testimony of Harlan Giles, M.D.); Joint Appendix at 598 (testimony of Dr. John Doe Number One), 688 (testimony of Dr. George Goler).
 
 
 45
 A few physicians, including plaintiff Haskell, employ the D & X procedure, which has also been called the "intact D & E" procedure and the "brain suction" procedure. The D & X procedure is typically used late in the second trimester, between the twentieth and twenty-fourth weeks of pregnancy, inclusive. The D & X procedure takes three days to perform.[8] On the first day, the physician puts dilators in the woman's cervix. On the second day, the physician removes the dilators and inserts new dilators in the cervix. On the third day, the dilators are removed and the membranes are ruptured. Then, with the guidance of ultrasound, the physician inserts forceps into the uterus, grasps a lower extremity of the fetus, and pulls the extremity into the vagina. The physician then uses his fingers to deliver the other lower extremity, followed by the torso, the shoulders, and the upper extremities. The head, which is too big to pass through the dilated cervix, remains in the internal cervical opening. At this point, while lifting the cervix and applying traction to the shoulders with his or her fingers, the physician takes a pair of blunt curved Metzenbaum scissors and forces the scissors into the base of the skull. Once the scissors has entered the skull, the physician spreads them to enlarge the opening. Finally, the physician removes the scissors, inserts a suction catheter into the hole, and removes the skull contents. The head will then compress, enabling the physician to remove the fetus completely from the woman.
 
 
 46
 As this summary demonstrates, the Act's definition of the D & X procedure encompasses the D & E procedure, because the D & E procedure can also entail suctioning the skull contents of the fetus. The primary distinction between the two procedures is that the D & E procedure results in a dismembered fetus while the D & X procedure results in a relatively intact fetus. More specifically, the D & E procedure involves dismembering the fetus in utero before compressing the skull by means of suction, while the D & X procedure involves removing intact all but the head of the fetus from the uterus and then compressing the skull by means of suction.[9] In both procedures, the fetal head must be compressed, because it is usually too large to pass through a woman's dilated cervix. In the D & E procedure, this is typically accomplished by either suctioning the intracranial matter or by crushing the skull, while in the D & X procedure it is always accomplished by suctioning the intracranial matter.
 
 
 47
 Apparently conceding that the D & E procedure can entail suctioning the fetal skull contents, appellants contend that the D & X definition only applies to procedures where the pregnancy is "terminated by purposeful insertion of the suction device to remove the brain, which does not occur in later second-trimester D & E abortions, where the suction device is applied to the skull (if at all) after the fetus has been substantially dismembered." Brief of Defendants-Appellants at 32. Although appellants do not make their point explicit, they apparently mean that in a D & E procedure, the pregnancy is terminated by dismemberment, while in a D & X procedure it is terminated by suctioning the intracranial matter. Appellants apparently assume that "termination" refers to the point at which the fetus' life ends rather than the abortion procedure itself. However, the Act's definition refers to the "termination of a human pregnancy" not of a fetal life. "Pregnancy" describes the woman's condition, which we do not believe is terminated until the abortion has been completed. Additionally, appellants stipulated that a fetus may be dead at the beginning of the D & X procedure, so termination of the fetus' life may not occur when the brain is suctioned. Finally, to the extent appellants are claiming that the D & E and D & X procedures can be distinguished by the point at which suctioning is employed in each procedure, their argument has no merit, because the Act's definition does not mention dismemberment or at what point in the procedure suctioning is prohibited; rather, the definition only mentions suctioning of the brain.
 
 
 48
 Appellants also contend that the Act's definition of the D & X procedure does not encompass the D & E procedure, because insertion of a suction device into the fetal skull during the D & E procedure is by "serendipity" or "happenstance" and therefore not "purposeful" as required by the Act's definition. Specifically, appellants point to the testimony of two witnesses. First, Dr. John Doe Number One testified that the way he inserts a cannula inside the calvarium to evacuate the calvarium after the fetus has been dismembered is by "serendipity." See Joint Appendix at 618-19. Second, Dr. George Goler testified that with the D & X procedure "it's a purposeful entrance into the skull. The other way, it's happenstance, in concurrence with a crushing of the skull." Id. at 696. Shortly after this statement, however, Dr. Goler agreed that during a D & E procedure, suction typically must be used to evacuate the skull contents in order to diminish the size of the head. See id. at 697. Moreover, after reviewing the testimony, we believe that Dr. Doe Number One meant that whether he accomplishes purposeful insertion of the suction device into the skull is happenstance. Earlier in his testimony, Dr. Doe Number One stated that it "would be my intent" to purposely insert a suction device into the skull to remove its contents. Id. at 607. Furthermore, when asked about how he employs suctioning during the D & E procedure, he testified that his "goal" would be to have "the tip of the suction curette ... impinge upon the calvarium, or head, that you at that point are suctioning out the intracranial contents. This will collapse the head." Id. at 598. Similarly, Dr. Mary Campbell testified that in doing a D & E procedure, the physician's goal is to insert a suction device into the cranium in order to remove the cranial matter and reduce the size of the skull, but that a physician may not be able to tell whether he or she has accomplished this goal, even with sonographic guidance. See id. 659-60. We believe the record amply supports the District Court's and our conclusion that the D & E procedure can entail purposely inserting a suctioning device into the skull in order to empty the brain contents.[10]
 
 
 49
 Finally, the Act's exception for "the suction curettage procedure of abortion and the suction aspiration procedure of abortion" does not include the D & E procedure. The Act does not define either of these procedures. "In the absence of ... a definition, we construe a statutory term in accordance with its ordinary or natural meaning." FDIC v. Meyer, 510 U.S. 471, 476, 114 S.Ct. 996, 1001, 127 L.Ed.2d 308 (1994). The evidence in this case establishes that physicians--the persons for whom the terms have common meaning--understand a suction curettage or aspiration[11] and a D & E to be two different abortion procedures. The suction curettage procedure is almost exclusively a first trimester procedure, whereas the D & E procedure is performed in the second trimester. In the second trimester, suction alone is often insufficient to remove the fetus. Although D & E includes suction curettage, it is a step in a process that entails additional instruments, namely forceps, and additional actions, namely dismemberment.
 
 
 50
 We conclude that the Act's definition of the prohibited abortion method includes both the D & E and D & X procedures. The Act therefore bans the use of both the D & E and D & X procedures. We next consider the implications of such a ban.
 
 3. Undue Burden Analysis
 
 51
 In one pre-Casey case, the Supreme Court considered a ban on an abortion procedure. In Planned Parenthood of Central Missouri v. Danforth, 428 U.S. 52, 75-79, 96 S.Ct. 2831, 2843-46, 49 L.Ed.2d 788 (1976), the Supreme Court considered the constitutionality of a ban on the use of saline amniocentesis as a method of abortion after the first twelve weeks of pregnancy. Under Roe, which governed Danforth, a State could regulate abortion during the second trimester in ways reasonably related to the mother's health. See Roe, 410 U.S. at 163-64, 93 S.Ct. at 732. The Danforth plaintiffs challenged the ban on the ground that it operated to preclude virtually all abortions after the first trimester, because a substantial percentage of all abortions performed in the United States after the first trimester, around 70% according to testimony, were effected through the procedure of saline amniocentesis. See Danforth, 428 U.S. at 76, 96 S.Ct. at 2844-45. The Court struck down the regulation because it would inhibit the vast majority of abortions after the first twelve weeks of pregnancy and would force a woman to undergo an abortion method more dangerous to her health. Id. at 77-79, 96 S.Ct. at 2844-46.
 
 
 52
 Although Roe 's second trimester standard allowed for fewer constitutional abortion regulations than does Casey 's undue burden standard, it follows that a statute which bans a common abortion procedure would constitute an undue burden. An abortion regulation that inhibits the vast majority of second trimester abortions would clearly have the effect of placing a substantial obstacle in the path of a woman seeking a pre-viability abortion. Therefore, the Court's analysis in Danforth is consistent with Casey 's undue burden standard and thus provides us with some guidance in this matter.
 
 
 53
 Because the definition of the banned procedure includes the D & E procedure, the most common method of abortion in the second trimester, the Act's prohibition on the D & X procedure has the effect "of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." Casey, 505 U.S. at 877, 112 S.Ct. at 2820. It does not matter that the D & E procedure typically is not performed late in the second trimester, when use of the D & X procedure is more common,[12] because the State may prosecute physicians who perform the D & E procedure at any time under the Act's definition of the banned procedure, which contains no temporal limitations. In other words, the definition of the banned procedure in no way limits its application to late second trimester abortions. As in Danforth, the Act bans the most commonly used second trimester procedure and therefore is an unconstitutional burden on a woman's right to choose to have an abortion.
 
 
 54
 Appellants argue that the affirmative defense provision eliminates any concern that the ban might restrict a woman's access to a D & X procedure in circumstances where other procedures are not safe. The Act provides as an affirmative defense that a charged physician may present prima facie evidence that all other abortion procedures would pose a greater risk to the health of the pregnant woman than the risk posed by the D & X procedure. See OHIO REV.CODE ANN. § 2919.15(C). This affirmative defense does not affect our analysis, however. The undue burden posed by the Act lies in the fact that the Act bans the most common second trimester procedure. The affirmative defense does not effectively remove that obstacle.[13]
 
 4. Post-Viability Application of the Ban
 
 55
 The undue burden standard applies only to pre-viability abortion regulations. See Casey, 505 U.S. at 877, 112 S.Ct. at 2820 ("A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." (emphasis added)). However, the State banned the performance of the D & X procedure "upon a pregnant woman" without reference to viability, and the record reveals that the procedure may be performed post-viability. Indeed, the District Court found that plaintiff Haskell has standing to challenge the Act's post-viability provisions, because he performs D & X procedures up through the twenty-fourth week of pregnancy and may be unable to rebut the presumption of viability in certain cases. See 911 F.Supp. at 1058-59. Because a State can proscribe all abortions post-viability, when not required for the life and health of the mother, we will assume arguendo that a State could restrict the abortion procedures performed post-viability, as long as abortions were still available to protect the life and health of the mother. Therefore, we must determine whether the post-viability ban on the D & X procedure is severable from the pre-viability ban on the D & X procedure.[14]
 
 
 56
 Severability is a matter of state law. Leavitt v. Jane L., 518 U.S. 137, ----, 116 S.Ct. 2068, 2069, 135 L.Ed.2d 443 (1996) (per curiam). The Act does not contain a severability provision. However, § 1.50 of Ohio's Revised Code provides that statutory provisions are presumptively severable:
 
 
 57
 If any provisions of a section of the Revised Code or the application thereof to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the section or related sections which can be given effect without the invalid provision or application, and to this end the provisions are severable.
 
 
 58
 OHIO REV.CODE ANN. § 1.50 (Anderson 1990). The Supreme Court of Ohio explained recently that "[i]n order to sever a portion of a statute, we must first find that such severance will not fundamentally disrupt the statutory scheme of which the unconstitutional provision is a part." State ex rel. Maurer v. Sheward, 71 Ohio St.3d 513, 644 N.E.2d 369, 377 (1994). More specifically, Ohio courts employ the following test for determining whether an unconstitutional provision may in fact be severed:
 
 
 59
 "(1) Are the constitutional and the unconstitutional parts capable of separation so that each may read and may stand by itself? (2) Is the unconstitutional part so connected with the general scope of the whole as to make it impossible to give effect to the apparent intention of the Legislature if the clause or part is stricken out? (3) Is the insertion of words or terms necessary in order to separate the constitutional part from the unconstitutional part, and to give effect to the former only?"
 
 
 60
 Id. (quoting Geiger v. Geiger, 117 Ohio St. 451, 160 N.E. 28, 33 (1927)).
 
 
 61
 We conclude that under Ohio law, the ban on the use of the D & X procedure post-viability cannot be severed from the unconstitutional portion of the ban. We assume that the Ohio General Assembly would prefer a ban on the use of the D & X procedure post-viability as opposed to no ban at all. See H 135, § 3, 121 Gen. Ass. (Ohio 1995) (declaring the legislature's intent is to "prevent the unnecessary use of a specific procedure used in performing an abortion"). However, the language of the ban simply makes it not susceptible to severance. Post-viability application of the ban cannot be separated from pre-viability application of the ban so that it may stand alone. There is no clause or word dealing with post-viability application of the ban. We essentially would have to rewrite the Act in order to create a provision which could stand by itself. This we cannot do. Accordingly, the entire ban on the D & X procedure must be struck down.
 
 5. Conclusion
 
 62
 We hold that the Act's ban on the D & X procedure is unconstitutional because the definition of the procedure encompasses the more commonly employed D & E procedure, and thereby places a substantial obstacle in the path of women seeking pre-viability abortions. The ban's application post-viability cannot be severed. Accordingly, the entire ban is unconstitutional.
 
 D. Post-Viability Ban and Regulations
 1. Introduction
 
 63
 The Casey Court "reaffirm[ed] Roe 's holding that 'subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.' " 505 U.S. at 879, 112 S.Ct. at 2821 (quoting Roe, 410 U.S. at 164-65, 93 S.Ct. at 732) (emphasis added).[15] In Casey, the Court began its analysis of the statute's constitutionality by considering the statute's definition of medical emergency, because it was "central to the operation of various other requirements." Id. The Casey plaintiffs challenged the constitutionality of the medical emergency exception, arguing that it foreclosed the possibility of an immediate abortion despite some significant health risks. Id. at 879-80, 112 S.Ct. at 2821-22. The Court explained that "[i]f the contention were correct, we would be required to invalidate the restrictive operation of the provision, for the essential holding of Roe forbids a State to interfere with a woman's choice to undergo an abortion procedure if continuing her pregnancy would constitute a threat to her health." Id. at 880, 112 S.Ct. at 2822. Indeed, "it could be argued that the freedom of a woman to decide whether to terminate her pregnancy for health reasons does in fact lie at the core of the constitutional liberty identified in [Roe ]." Harris v. McRae, 448 U.S. 297, 316, 100 S.Ct. 2671, 2687-88, 65 L.Ed.2d 784 (1980), cited in Casey, 505 U.S. at 880, 112 S.Ct. at 2822. Thus, any abortion regulation that might delay an abortion must contain a valid medical emergency exception. See Planned Parenthood of Southeastern Pennsylvania v. Casey, 947 F.2d 682, 699 (3d Cir.1991), aff'd in part and rev'd in part, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). Moreover, any regulation that prevents post-viability abortions must contain a valid medical necessity exception. See Casey, 505 U.S. at 879, 112 S.Ct. at 2821-22.
 
 
 64
 With regard to the medical necessity exception to the post-viability abortion ban, the District Court held that the definition of "serious risk of the substantial and irreversible impairment of a major bodily function," found in both the medical necessity and medical emergency exceptions, was unconstitutional because it limited the performance of post-viability abortions to those situations in which a woman's physical health was threatened, and thereby impermissibly limited the physician's discretion to determine what measures were necessary to preserve her health, including mental health. See 911 F.Supp. at 1078-81. With regard to the medical emergency exception to the post-viability abortion regulations, the court held that the definition of "medical emergency" was unconstitutional because (1) both the definition and the criminal and civil liability provisions lacked scienter requirements and (2) the requirement that a physician's determination be objectively reasonable to other physicians would chill the performance of post-viability abortions where, in the physician's own best judgment, an abortion is necessary to preserve the life or health of the mother. See id. at 1081-87.
 
 
 65
 We conclude that the medical necessity and medical emergency provisions are unconstitutionally vague, because they lack scienter requirements. Because the constitutionality of the post-viability regulations depends upon the constitutionality of these two provisions, all of the post-viability regulations must be struck down.
 
 2. Lack of Scienter Requirement
 
 66
 The term "scienter" means "knowingly" and is used to signify a defendant's guilty knowledge. BLACK'S LAW DICTIONARY 1345 (6th ed.1990). It requires that a defendant have some degree of guilty knowledge or culpability in order to be found criminally liable for some conduct. Statutes imposing criminal liability without a mental culpability requirement are generally disfavored. See Staples v. United States, 511 U.S. 600, 605-06, 114 S.Ct. 1793, 1797, 128 L.Ed.2d 608 (1994).
 
 
 67
 The Act's "medical emergency" definition requires the physician to determine "in good faith and in the exercise of reasonable medical judgment" whether an emergency exists. OHIO REV.CODE ANN. § 2919.16(F). Similarly, the medical necessity exception to the post-viability ban requires that the physician determine "in good faith and in the exercise of reasonable medical judgment" that the abortion is necessary. See id. § 2919.17(A)(1). Thus, both of these provisions contain subjective and objective elements in that a physician must believe that the abortion is necessary and his belief must be objectively reasonable to other physicians. This dual standard as written contains no scienter requirement. Therefore, a physician may act in good faith and yet still be held criminally and civilly liable if, after the fact, other physicians determine that the physician's medical judgment was not reasonable. In other words, a physician need not act wilfully or recklessly in determining whether a medical emergency or medical necessity exists in order to be held criminally or civilly liable; rather, under the Act, physicians face liability even if they act in good faith according to their own best medical judgment.
 
 
 68
 In Colautti v. Franklin, 439 U.S. 379, 390-97, 99 S.Ct. 675, 683-87, 58 L.Ed.2d 596 (1979), the Court considered the constitutionality of a Pennsylvania abortion law that required every person who performed or induced an abortion to make a determination, "based on his experience, judgment or professional competence," that the fetus was not viable. If that person determined that the fetus was viable, or "if there [was] sufficient reason to believe that the fetus [might] be viable," then the person had to adhere to a prescribed standard of care. The Court found that it was unclear whether the statute imposed a purely subjective standard, or whether it imposed a mixed subjective and objective standard. See id. at 391, 99 S.Ct. at 683-84. Therefore, the Court held that the provision was unconstitutionally vague. See id. at 393-94, 99 S.Ct. at 684-85. The Court did not consider whether a mixed standard would be unconstitutional, but it did conclude that the statute did not contain a scienter requirement. See id. at 394 & n. 12, 99 S.Ct. at 685 & n. 12. "Because of the absence of a scienter requirement in the provision directing the physician to determine whether the fetus is or may be viable, the statute is little more that 'a trap for those who act in good faith.' " Id. at 395, 99 S.Ct. at 685 (quoting United States v. Ragen, 314 U.S. 513, 524, 62 S.Ct. 374, 379, 86 L.Ed. 383 (1942)).[16] Moreover, the Court explained:
 
 
 69
 The perils of strict criminal liability are particularly acute here because of the uncertainty of the viability determination itself. As the record in this case indicates, a physician determines whether or not a fetus is viable after considering a number of variables.... Because of the number and the imprecision of these variables, the probability of any particular fetus' obtaining meaningful life outside the womb can be determined only with difficulty.... In the face of these uncertainties, it is not unlikely that experts will disagree.... The prospect of such disagreement, in conjunction with a statute imposing strict civil and criminal liability for an erroneous determination of viability, could have a profound chilling effect on the willingness of physicians to perform abortions ... in the manner indicated by their best medical judgment.
 
 
 70
 Id. at 395-96, 99 S.Ct. at 686 (footnotes omitted)
 
 
 71
 Because the Colautti Court found the viability-determination provision void on its face, it did not decide whether, under a properly worded statute, a finding of bad faith or some other scienter would be required before a physician could be held criminally responsible for an erroneous viability determination. Id. at 396, 99 S.Ct. at 686. Nevertheless, we find Colautti strongly indicative of the Court's view that in this area of the law, scienter requirements are particularly important. The determination of whether a medical emergency or necessity exists, like the determination of whether a fetus is viable, is fraught with uncertainty and susceptible to being subsequently disputed by others. Moreover, the lack of scienter is compounded by the fact that this Act requires that a physician meet both an objective and a subjective standard in order to avoid liability. While we need not decide whether employment of an objective standard with a scienter requirement would be constitutional, an objective standard without one is especially troublesome in the abortion context. In an area as controversial as abortion, the need for a scienter requirement is, as the Supreme Court pointed out, particularly important. In this area where there is such disagreement, it is unlikely that the prosecution could not find a physician willing to testify that the physician did not act reasonably. Under the Act, a physician who performs a post-viability abortion under either the medical emergency or medical necessity exception may be held liable, even if the physician believed he or she was acting reasonably, and in accordance with his or her best medical judgment, as long as others later decide that the physician's actions were nonetheless unreasonable. The objective standard combined with strict liability for even good faith determinations, "could have a profound chilling effect on the willingness of physicians to perform abortions," Colautti, 439 U.S. at 396, 99 S.Ct. at 686, when abortions are constitutionally permitted post-viability, i.e. when the woman's health or life is threatened. The uncertainty induced by this statute therefore threatens to inhibit the exercise of constitutionally protected rights. See id. at 391, 99 S.Ct. at 683 (citing Grayned v. City of Rockford, 408 U.S. 104, 109, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972)). Thus, the combination of the objective and subjective standards without a scienter requirement renders these exceptions unconstitutionally vague, because physicians cannot know the standard under which their conduct will ultimately be judged.
 
 
 72
 Two decisions of the Eighth Circuit support our conclusion in this case. In Fargo Women's Health Organ. v. Schafer, 18 F.3d 526, 534-35 (8th Cir.1994), the Eighth Circuit held constitutional a medical emergency provision in a North Dakota abortion law. The law required the physician to rely on his or her "best clinical judgment" in determining whether a condition constitutes a medical emergency. See id. at 534. The court found that this standard was not vague and that the law contained a scienter requirement that prevented a vagueness finding. See id. at 534-35. Although the law itself did not specify a culpability standard, the court found that North Dakota law mandated that a requirement of willfulness be imported into the statute. See id. "This strict scienter requirement, which adequately notifies physicians that certain conduct is prohibited, is an additional basis for saving the statute from the Organization's vagueness challenge." Id. at 535 (citing Colautti, 439 U.S. at 395, 99 S.Ct. at 685-86).
 
 
 73
 Subsequently, in Planned Parenthood, Sioux Falls Clinic v. Miller, 63 F.3d 1452, 1463-67 (8th Cir.1995), the Eighth Circuit considered the constitutionality of the civil-damages and criminal-penalty provisions of a South Dakota abortion law. The court found that neither provision contained a scienter requirement. Id. at 1463. It then determined that the South Dakota courts would not import a scienter requirement into the Act. See id. at 1464-66. It thus held that, "without a scienter requirement, this strict criminal-liability statute will have a 'profound chilling effect on the willingness of physicians to perform abortions' " and would create an undue burden. See id. at 1465 (quoting Colautti, 439 U.S. at 396, 99 S.Ct. at 686); see also id. at 1467 (striking down civil-penalty provision on same ground).
 
 
 74
 The issues presented in this case are more closely aligned with those in Colautti and Miller, than those in Schafer. Unlike North Dakota law, Ohio law does not provide for the importation of a scienter requirement in this case.[17] Without a scienter requirement, the Act does not adequately notify a physician that certain conduct is prohibited; rather, a physician may be held criminally and civilly liable for adhering to his or her own best medical judgment. As in Colautti and Miller, this lack of scienter will have a profound chilling effect on the willingness of physicians to perform abortions. Moreover, this chilling effect is exacerbated in this case because of the dual standard included in the Act.[18] A physician simply does not know against which standard his conduct will be tested and his liability determined.
 
 
 75
 Appellants argue that the Act contains a scienter requirement for the medical necessity exception, because § 2919.17(A) provides that "[n]o person shall purposely perform or induce or attempt to perform or induce an abortion." Similarly, they argue that the medical emergency exception contains a scienter requirement because § 2919.17(B) provides that "[n]o person shall purposely perform or induce or attempt to perform or induce an abortion." The scienter requirement in both of these sections, however, goes to the performance of the abortion, not to the determination of medical necessity or medical emergency. In other words, if a physician were performing a non-abortion operative procedure on a woman and accidentally caused the fetus to be aborted, the physician would not violate the Act. The problem here is that the Act does not require scienter in the physician's determination of medical necessity and medical emergency. Appellants' argument therefore has no merit.
 
 
 76
 Thus, we conclude that the medical emergency and medical necessity exceptions are unconstitutional. Accordingly, we hold unconstitutional the Act's post-viability ban and regulations. While we need not consider the constitutionality of the other post-viability abortion regulations, because their validity depends upon the constitutionality of the provisions, we do address the lack of mental health exception for postviability since it was extensively briefed and argued. Further, if the statute is amended to meet the deficiencies found here, this issue will still remain.
 
 
 77
 The District Court also held the statute unconstitutional in that it made no provision for post-viability abortions where there was serious risk of the substantial and irreversible impairment of the pregnant woman's mental health.
 
 
 78
 The medical necessity exception to the post-viability abortion ban provides that an abortion may be performed in order to avert the death of the pregnant woman, or to avoid a "serious risk of the substantial and irreversible impairment of a major bodily function." See OHIO REV.CODE ANN. §§ 2919.16(F), 2919.17(A)(1). The statute defines a "serious risk of the substantial and irreversible impairment of a major bodily function" as follows:
 
 
 79
 [A]ny medically diagnosed condition that so complicates the pregnancy of the woman as to directly or indirectly cause the substantial and irreversible impairment of a major bodily function, including, but not limited to, the following conditions:
 
 
 80
 (1) Pre-eclampsia;
 
 
 81
 (2) Inevitable abortion;
 
 
 82
 (3) Prematurely ruptured membrane;
 
 
 83
 (4) Diabetes;
 
 
 84
 (5) Multiple sclerosis.
 
 
 85
 Id. § 2919.16(J). On its face, this definition appears to be limited to physical health risks, as opposed to mental health risks. Indeed, defendants asserted at oral argument that the definition should be construed as limited to physical health conditions.
 
 
 86
 In the Act, the General Assembly declared that, in using the phrase "serious risk of the substantial and irreversible impairment of a major bodily function" in §§ 2919.16 and 2919.17, "it is the intent of the General Assembly that the phrase be construed according to the interpretation given to that phrase in Planned Parenthood v. Casey, 505 U.S. 833, 879-81, 112 S.Ct. 2791, 2822, 120 L.Ed.2d 674 (1992), and Planned Parenthood v. Casey, 947 F.2d 682, 699-702 (3d Cir.1991)." H. 135, § 4, 121st Gen. Ass. (Ohio 1995). Defendants argue that the Supreme Court in Casey upheld a substantially identical maternal health exception, as construed by the Third Circuit, and that since the Act's provision is to be similarly construed, it is also constitutional. Plaintiffs counter that (1) the challenged definition in Casey was upheld because the Third Circuit had broadly construed it as "not in any way pos[ing] a significant threat to the life or health of a woman," Casey, 505 U.S. at 880, 112 S.Ct. at 2822, and "health" includes mental as well as physical health, and (2) the Casey definition cannot be compared to the one in this case because in Casey the definition created an exception to the delays associated with the twenty-four-hour waiting period and parental consent provisions while the post-viability ban prevents all post-viability abortions. Although we agree that the definition in Casey was clearly limited to physical health risks, we conclude that Casey is distinguishable and that the Act unconstitutionally limits the performance of post-viability abortions to those cases in which a pregnant woman's physical health is threatened.
 
 
 87
 Casey does suggest that the Act's definition of "serious risk of the substantial and irreversible impairment of a major bodily function" should be interpreted as limited to physical health conditions and, moreover, is constitutional. The dispute in Casey was whether the phrase "serious risk" included pre-eclampsia, inevitable abortion, and premature ruptured membrane.[19] See Casey, 947 F.2d 682, 699-702 (3d Cir.1991). The district court in that case had declared the definition unconstitutionally narrow because these three conditions could pose a serious threat to a woman's health without immediately creating a serious risk of substantial and irreversible impairment of a major bodily function. See Casey, 744 F.Supp. 1323, 1377-78 (E.D.Pa.1990). After discussing these three medical conditions, the court of appeals concluded that "serious risk" should be construed to include such conditions. More specifically, the court found that while the wording of the provision did not cover negligible risks to life or health or significant risks of only transient health problems, it should cover conditions that could lead to death or permanent injury. See Casey, 947 F.2d at 701. This "broad" construction, however, was clearly limited to "physically threatening emergencies." See id. at 702.
 
 
 88
 The Supreme Court in Casey deferred to the appellate court's construction of the medical emergency provision, quoting the following statement from that court's decision: "[W]e read the medical emergency exception as intended by the Pennsylvania legislature to assure that compliance with its abortion regulations would not in any way pose a significant threat to the life or health of the mother." 505 U.S at 880, 112 S.Ct. at 2822 (quoting 947 F.2d at 701). Thus, plaintiffs here argue that the Court upheld the challenged definition in Casey, because the Third Circuit's broad construction ensured that significant threats to the life or health of a woman would be covered. But, as we have seen, the Third Circuit's "broad" construction was limited to physical conditions. Indeed, the court in conclusion stated: "The essence of the definition ... is that it allows a woman and her doctors to forego many of the Act's requirements when there is a medical emergency to the woman's physical health, and that includes where a woman has symptoms of preeclampsia, inevitable abortion, or prematurely ruptured membrane." 947 F.2d at 701 (emphasis added). The Act in this case expressly includes these conditions in its nonexhaustive list of covered physical health risks.
 
 
 89
 Nevertheless, this case is distinguishable from Casey. Here, we are faced with a regulation that bans post-viability abortions, while in Casey the Court was faced with a regulation that only delayed abortions. In upholding the medical emergency exception, the Casey Court was saying that in the pre-viability context, the medical emergency exception did not place a substantial obstacle in the path of a woman seeking an abortion. See 505 U.S. at 880, 112 S.Ct. at 2822 ("[A]s construed by the Court of Appeals, the medical emergency definition imposes no undue burden on a woman's abortion right."). Importantly, a woman would still be free to choose to have an abortion. Although the State may prohibit post-viability abortions--i.e., the undue burden standard is inapplicable--it must continue to permit abortions "where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." Id. at 879, 112 S.Ct. at 2821. Therefore, we reject defendants' reliance on Casey for support of its argument that the Act's medical necessity exception is constitutional.
 
 
 90
 Determining whether a maternal health exception is constitutional when it is limited to physical health problems depends upon what the Supreme Court means by "necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." At least two Supreme Court cases address some of the words in this phrase. The main case, and the one upon which the District Court relied, is Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), which was decided the same day as Roe, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147. In Doe, the plaintiffs challenged the constitutionality of a Georgia statute which made it a crime for a physician to perform an abortion except when it was "based upon his best clinical judgment that an abortion is necessary." Doe, 410 U.S. at 202, 93 S.Ct. 739, 35 L.Ed.2d 201. The plaintiffs argued that the word "necessary" was unconstitutionally vague because it did not warn physicians of what conduct was proscribed. Id. The Court found that United States v. Vuitch, 402 U.S. 62, 71-72, 91 S.Ct. 1294, 1299, 28 L.Ed.2d 601 (1971) controlled. Id. at 191-92, 93 S.Ct. at 747-48. In Vuitch, a vagueness issue was raised with respect to a statute which made abortions criminal "unless the same were done as necessary for the preservation of the mother's life or health." Id. at 191, 93 S.Ct. at 747. The statute was construed as bearing upon psychological as well as physical well-being, and "this being so, the [Vuitch ] Court concluded that the term 'health' presented no problem of vagueness," because physicians routinely make such judgments. Id. at 191-92, 93 S.Ct. at 747-48. Similarly, the Doe Court found, whether an abortion is "necessary" is a professional judgment that physicians routinely make. Id. The Doe Court then stated:
 
 
 91
 [M]edical judgment may be exercised in the light of all factors--physical, emotional, psychological, familial, and the woman's age--relevant to the well-being of the patient. All these factors may relate to health. This allows the attending physician the room he needs to make his best medical judgment.
 
 
 92
 Id. (emphasis added).
 
 
 93
 The Court also has emphasized the importance of giving the physician discretion to decide whether an abortion is necessary. In Colautti v. Franklin, 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979), the Court held unconstitutionally vague the viability-determination requirement in a Pennsylvania law. Specifically, the challenged provision required every person who performed or induced an abortion to make a determination, "based on his experience, judgment or professional competence," that the fetus was not viable; if such person determined that the fetus was viable, or if "there [wa]s sufficient reason to believe that the fetus may be viable," then the person had to adhere to a prescribed standard of care. Id. at 391, 99 S.Ct. at 683. It was unclear whether the statute contained a purely subjective standard or whether it imposed a mixed subjective and objective standard. Id. The Court suggested, however, that it favored providing broad discretion to physicians to make determinations as to "medical necessity" in the abortion context:
 
 
 94
 The contested provisions in [Doe and Vuitch ] had been interpreted to allow the physician to make his determination in the light of all attendant circumstances--psychological and emotional as well as physical--that might be relevant to the well-being of the patient. The present statute does not afford broad discretion to the physician.
 
 
 95
 Id. at 394, 99 S.Ct. at 685 (emphasis added).
 
 
 96
 The issue whether a State may ban post-viability abortions except where necessary to preserve the woman's physical health, even if carrying the fetus to term would cause the woman to suffer severe mental or emotional harm, is a question of first impression for this Circuit.[20] We believe the Court will hold, despite its decision in Casey, that a woman has the right to obtain a post-viability abortion if carrying a fetus to term would cause severe non-temporary mental and emotional harm. Doe and Vuitch--which both involved regulations essentially prohibiting, as opposed to delaying, abortions--strongly suggest that a State must provide a maternal health exception to an abortion ban that encompasses situations where a woman would suffer severe mental or emotional harm if she were unable to obtain an abortion. Moreover, Roe and Doe were decided on the same day and "are to be read together." Roe, 410 U.S. at 165, 93 S.Ct. at 733. Therefore, Roe 's prohibition on state regulation when an abortion is necessary for the "preservation of the life or health of the mother," id., must be read in the context of the concept of health discussed in Doe, see id. at 191-92, 93 S.Ct. at 747-48. Accordingly, the Act's medical necessity exception is unconstitutional, because it does not allow post-viability abortions where necessary to prevent a serious non-temporary threat to a pregnant woman's mental health. Additionally, drawing on Colautti, we find that the Act impermissibly limits the physician's discretion to determine whether an abortion is necessary to preserve the woman's health, because it limits the physician's consideration to physical health conditions. See Colautti, 439 U.S. at 387, 99 S.Ct. at 681 (stating that the Doe Court found it "critical" that, in deciding whether an abortion was necessary, the physician's judgment "may be exercised in the light of all factors--physical, emotional, psychological, familial, and the woman's age--relevant to the well-being of the patient").
 
 
 97
 Defendants argue that a broad maternal health exception will render meaningless the State's compelling interest in protecting fetal life and its right to actually proscribe postviability abortions. We recognize the problems associated with a mental health exception. However, we emphasize that we are holding that a maternal health exception must encompass severe irreversible risks of mental and emotional harm. The State's substantial interest in potential life must be reconciled with the woman's constitutional right to protect her own life and health. We believe that in order to reconcile these important interests, the Constitution requires that if the State chooses to proscribe post-viability abortions, it must provide a health exception that includes situations where a woman is faced with the risk of severe psychological or emotional injury which may be irreversible. We therefore hold that the Act's restrictive medical necessity exceptions is unconstitutional.
 
 E. Prosecutor's Appeal
 
 98
 The Montgomery County Prosecutor seeks dismissal, arguing that he is a nominal party, because his presence in the lawsuit was neither crucial to establish venue nor necessary to adjudicate the constitutionality of the Act. In the alternative, he asserts that the District Court erred in failing to join as necessary parties either the other prosecutors for counties in which plaintiff Haskell performs abortions or the remaining eighty-seven Ohio County Prosecutors. Finally, the prosecutor maintains that the District Court lacked jurisdiction by failing to join as necessary parties the other Ohio prosecutors.
 
 
 99
 The prosecutor sought dismissal during a chambers conference on November 6, 1995:
 
 
 100
 Ms. Cohen: It seems to me that we're really not necessary to this lawsuit, and I am wondering if Al would like to voluntarily dismiss us.
 
 
 101
 The Court: I don't think. I think Al indicated at the beginning that you were joined only because you're the entity that would be filing the criminal charges.
 
 
 102
 Perhaps Al would be willing to voluntarily dismiss you ... if you would agree to be bound by any order of the Court, interlocutory and final, without being named as a party defendant.
 
 
 103
 First of all, would you agree to that, before I'll ask Al if that's satisfactory?
 
 
 104
 Ms. Cohen: We would not agree to that, Judge.
 
 
 105
 ....
 
 
 106
 The Court: You're named, in effect, as a nominal party because of the plaintiff's request that I find the statute unconstitutional and enjoin its enforcement. And, by having you as a party to the lawsuit and a party to the injunction, if I hold the statute unconstitutional, you cannot begin a prosecution.
 
 
 107
 Joint Appendix at 883-86.
 
 
 108
 The prosecutor relies on Children's Healthcare is a Legal Duty, Inc. v. Deters, 894 F.Supp. 1129, 1131-32 (S.D.Ohio 1995), rev'd on other grounds, 92 F.3d 1412 (6th Cir.1996), in which the district court held that the city and county prosecutors were unnecessary defendants in a lawsuit challenging the constitutionality of provisions of the Ohio Revised Code. The District Court dismissed the prosecutors, holding that the Attorney General would represent the interests of the State. This case is distinguishable, however, because in Children's Healthcare, the plaintiffs claimed that the prosecutors had failed to prosecute actions that the state had deemed legal; in other words, the prosecutors had no reason to prosecute under the law. "The law makers not the law enforcers are the proper defendants in this type of suit." Id. at 1132. Thus, there was no danger of potential prosecution and no need to enjoin the prosecutor from charging the plaintiffs with a crime. Here, the prosecutors could charge plaintiff Haskell, who performs abortions in Montgomery County, with violating the Act.
 
 
 109
 In the appeal of Children's Healthcare, this Court held that the Eleventh Amendment barred the action against the Attorney General, because Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), did not apply, and because the action did not fall with the Young exception because the plaintiffs did not seek to enjoin the enforcement of an allegedly unconstitutional statute. See 92 F.3d at 1416. We did not address the propriety of the dismissal of the prosecutors. However, we did cite favorably the district court's decision in Akron Cen. for Reprod. Health v. Rosen, 633 F.Supp. 1123, 1130 (N.D.Ohio 1986), aff'd on other grounds, 854 F.2d 852 (6th Cir.1988), rev'd on other grounds, 497 U.S. 502, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990) which dismissed the Ohio Governor and Attorney General because they had no connection in the enforcement of a statute while noting that enforcement was clearly delegated to the state's prosecuting attorneys. More relevant to this case is the district court's holding that the county and city prosecutors were proper defendants in a suit challenging the constitutionality of an abortion law. In that case, the two prosecutors named as defendants argued that the duty to defend the constitutionality of state statutes falls upon the state attorney general, and that therefore they should be dismissed. See 633 F.Supp. at 1128. The district court explained that the prosecutors still had a role in the action, because their statutorily defined duties demonstrated that they would be required to enforce the statute against the plaintiffs. Id. at 1128-29. "Accordingly, both [prosecutors] are proper parties to bear the injunctive relief requested by the plaintiffs. While they may understandably expect that the state will bear the costs of defending this litigation, they cannot be dismissed as defendants." Id. at 1129.
 
 
 110
 The prosecutor argues that he is unnecessary for the court to make a determination as to the Act's constitutionality. But as the District Court held, the prosecutor is necessary in terms of injunctive relief. If the District Court found the Act unconstitutional, as it did, the prosecutor would not have been bound by the injunction if he were not a party. Therefore, the District Court did not err in declining to dismiss the prosecutor.
 
 
 111
 The prosecutor did not raise his other two arguments relating to nonjoinder before the District Court. Therefore, before dismissing for failure to join indispensable parties, we should consider whether denying dismissal will have serious prejudicial effects on the non-joined parties. 7 CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE, § 1609, at 140 n.27 (2d ed.1986). The prosecutor first argues that the other county prosecutors are necessary parties because without them plaintiffs' relief is inadequate in that other prosecutors in counties where plaintiff performs abortions are not bound by the injunction. This is plaintiffs' problem, however, and does not affect any of the Montgomery County Prosecutor's interests. Second, the prosecutor argues that joinder is necessary because the other prosecutors have a legally protected interest in the subject of the action, i.e., the constitutionality of the Act. We find that the Attorney General has vigorously defended the constitutionality of the Act. Apart from the issue of attorney's fees, we cannot see how the interests of the other county prosecutors can be considered different from those of the State at this point in the Act's history. We therefore conclude that dismissal for nonjoinder would be inappropriate and the District Court did not err in not joining the other prosecutors.
 
 III. Conclusion
 
 112
 For the foregoing reasons, we AFFIRM.
 
 DISSENT
 
 113
 BOGGS, Circuit Judge, dissenting.
 
 
 114
 In my view, Ohio's ban on the D & X procedure is constitutional. Therefore, I must dissent from the court's holding to the contrary. Likewise, I dissent from the majority's holding that the "medical necessity" and "medical emergency" provisions are unconstitutional because of their lack of a scienter requirement. Further, I believe that, to the extent that Casey requires a mental-health component to the required medical emergency exemption, the language in Casey incorporated by the Ohio legislature is sufficiently broad to encompass such a requirement. Because I believe the substance of Ohio's partial-birth abortion statute passes constitutional muster, I would not address the question whether the Sixth Circuit should now discount, in all abortion cases, the test for facial constitutional challenges stated by the Supreme Court in United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987).[1]
 
 
 115
 * The regulation of abortions is one of the most controversial issues of our time. Normally, such controversial issues are left to the political arena, with each side fighting to win the electorate over to its view. The Supreme Court has reminded us time and again that, rather than reaching out to strike down statutes that are arguably unconstitutional, the federal courts are to interpret statutes so as to avoid difficult constitutional questions where possible. See, e.g., Kent v. Dulles, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958) (construing ambiguous federal statute to avoid First Amendment problem); Adams Fruit Co. v. Barrett, 494 U.S. 638, 647, 110 S.Ct. 1384, 1389, 108 L.Ed.2d 585 (1990) (construing ambiguous state statute to avoid preemption problem). The reason federal courts should only take up constitutional questions when required to do so is that, in a constitutional democracy, courts ought not to disturb the judgments of the democratically elected branches of government unless the constitutionality of those judgments is clearly in question. See generally Cass R. Sunstein, Foreword: Leaving Things Undecided, 110 HARV. L. REV. 4 (1996). It appears to me that the majority's opinion strains to interpret Ohio's partial-birth abortion statute so as to make the burden imposed by Ohio's ban on dilation-and-extraction ("D & X") abortions, and on most post-viability abortions, appear "undue" in violation of Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). As I hope to show, this interpretation is neither correct nor appropriate.
 
 
 116
 The abortion area, of course, has been largely constitutionalized, as the Supreme Court has made clear in a line of decisions starting with Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Some choices, however, remain within the state's legislative power. These choices have not always been well delineated by the Court, with the result that pro-life advocates continue to seek greater controls on abortion, while pro-choice advocates continue to push for complete constitutional protection of all abortion procedures. This has left us, as the body bound to interpret the Constitution and Supreme Court precedent, squarely in the middle. Our obligation, as an intermediate appellate court, is to apply faithfully the guidance handed down to us, neither unduly expanding, nor capriciously contracting, the leeway properly reserved for democratic choice.
 
 
 117
 As I read the Supreme Court decisions, two principles relevant to today's case have been authoritatively decided: (1) a particular method of abortion can be banned, if such a ban does not create an "undue burden" on a woman's right to choose an abortion, see Casey, 505 U.S. at 880, 112 S.Ct. at 2822; and (2) post-viability abortions can be banned "except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." Id. at 879, 112 S.Ct. at 2821 (plurality opinion) (citation omitted).
 
 
 118
 At oral argument, counsel for the abortionists asserted, with commendable candor, their position that these principles, properly interpreted, pose no barrier to any woman seeking an abortion at any time for any purpose. Their logic is based on the continuing use of language such as "consultation with her doctor" and "appropriate medical judgment." In their view, the use of this language necessarily implies that any abortion that the mother will request or the doctor will perform must remain available, despite the two principles above. With regard to the first principle, the reasoning is that any statute prohibiting a mother from obtaining her preferred abortion procedure ipso facto places an "undue burden" on her right to choose an abortion.. With regard to principle two, counsel's logic is that any statute restricting a doctor's choice of abortion procedure automatically violates Casey 's "appropriate medical judgment" caveat.
 
 
 119
 But surely this proves too much. If this logic were correct--and it was certainly pressed on the Court at the time of the Casey and Danforth decisions--surely the Court would have said so, rather than setting up a maze that legislatures can in fact never successfully negotiate (despite the Court's apparent invitation to them to try). To adopt the plaintiffs' position would be to assume that the Supreme Court is deeply dishonest rather than simply deeply divided. I choose not to believe that, and thus believe that the Court meant what it said in permitting state abortion regulations in certain contexts. We therefore must take it as a given that some post-viability abortions may be banned and that some methods of abortion can be banned generally.
 
 
 120
 The specific question we must address today thus is not whether Ohio can regulate abortion--clearly it can--but whether Ohio "got it right" in its effort constitutionally to regulate one particularly offensive abortion procedure. To put it differently, did Ohio, in its zeal to implement the political will of its citizens, sweep too broadly in regulating certain categories of abortion procedures, or are the plaintiffs here simply attempting, by a variety of artful stratagems, to prevent the Ohio legislature from exercising any powers over abortion? With respect to the Ohio legislature's attempt to ban the D & X procedure, I believe that Ohio got it right.
 
 
 121
 First, while the evidence presented to the district court supports its finding that the D & X procedure may pose less risk to some women in some cases than the available alternative procedures, see Women's Med. Prof. Corp. v. Voinovich, 911 F.Supp. 1051, 1068-71 (S.D.Ohio 1995), the district court has not found that the other procedures are unsafe or unavailable. Such a finding was crucial to the Supreme Court's decision in Planned Parenthood of Central Missouri v. Danforth, 428 U.S. 52, 75-77, 96 S.Ct. 2831, 2844-45, 49 L.Ed.2d 788 (1976). In Danforth, the Court struck down a ban on saline injection abortions based on evidence that showed that the saline method was the most commonly used method of abortion and that the proffered alternative method, prostaglandin suppositories, was not available to women at that time. In this case, by contrast, the district court made no finding that the D & X procedure is commonly used or that there are no other safe alternative methods available to women in Ohio. In fact, it found to the contrary. See Voinovich, 911 F.Supp. at 1068-71.
 
 
 122
 Second, Danforth must be read in light of the later Casey decision. The Danforth Court relied on Roe 's formalistic trimester framework, under which Missouri's ban on saline abortions in the second trimester could be upheld only if based on the health interests of the mother. As the majority acknowledges, see supra at 192, Casey did away with the trimester framework, focusing instead on whether the regulation posed an "undue burden" on the woman's right to choose an abortion. See Casey, 505 U.S. at 880, 112 S.Ct. at 2822. The plurality opinion also emphasized the need to give more weight to a state's asserted interest in the potentiality of life. See id. at 875, 112 S.Ct. at 2819-20 ("Not all governmental intrusion is necessarily unwarranted; and that brings us to the other basic flaw in the trimester framework: even in Roe 's terms, in practice it undervalues the State's interest in the potential life within the woman."). Therefore, given this new framework, a finding that a procedure is simply "safer" in some instances is not sufficient. Rather, the district court would need to have found that the D & X method is the safer procedure in most circumstances, especially when confronted with such a rarely used procedure. See Danforth, 428 U.S. at 76, 96 S.Ct. at 2844-45.
 
 
 123
 If there is any doubt as to the constitutionality of Ohio's D & X ban standing by itself, it is resolved by the fact that the Ohio statute provides for an affirmative defense to liability for situations in which all other available abortion procedures pose a greater danger to the mother's health. It thus eliminates any concern that the law might restrict a woman's access to the D & X procedure in those actual circumstances where other procedures are not as safe. The fact that this exception is an affirmative defense does not undermine its constitutionality. See Simopoulos v. Virginia, 462 U.S. 506, 510, 103 S.Ct. 2532, 2535-36, 76 L.Ed.2d 755 (1983) (abortion statute was not unconstitutionally applied to a physician on the asserted ground that the state failed to prove the lack of medical necessity for a second-trimester abortion since, under state law, the prosecution was not obligated to prove lack of medical necessity beyond a reasonable doubt until defendant invoked medical necessity as a defense). The majority's offhand dismissal of the significance of the affirmative defense provision, see supra at 200-01, is especially puzzling given the Supreme Court's repeated endorsement of criminal statutes placing the burden of raising a particular affirmative defense on the defendant. See, e.g., Engle v. Isaac, 456 U.S. 107, 120-21, and n. 20, 102 S.Ct. 1558, 1568 and n. 20, 71 L.Ed.2d 783 (1982); Mullaney v. Wilbur, 421 U.S. 684, 701-03, nn. 28, 30, 31, 95 S.Ct. 1881, 1891-92, nn. 28, 30, 31, 44 L.Ed.2d 508 (1975).
 
 
 124
 I believe that the majority, in dismissing the importance of the affirmative defense provision in the statute, has erroneously focused on an extreme case, accepting plaintiffs' argument that women would be required to bear an increased medical risk because the fear of prosecution will spur physicians to use alternative procedures even when the D & X procedure is the safest method. Such an extreme example, however, obscures the reality that all criminal laws chill conduct that is at the margins of legality. In any event, it is inappropriate for the majority to rely on such an extreme hypothetical case since the evidence shows that the D & X procedure is never medically indicated. The strongest finding the district court could make was that late in the second trimester of pregnancy the D & X procedure "does appear to have the potential of being safer than all other available abortion procedures." 911 F.Supp. at 1070. As the district court recognized, however, even this finding has never been scientifically proved. Voinovich, 911 F.Supp. at 1068-69 ("The Court acknowledges that if there were a statistical study, published in a peer review journal, which demonstrated the benefits of the D & X procedure, this would make the asserted benefits more credible.").
 
 
 125
 One doctor testified that the D & X procedure is "essentially identical" to a procedure used and abandoned by the medical profession because it posed safety risks to the mother, including perforation of the uterus, injury to the cervix and/or vagina, and infection. Although the district court discounted this testimony because of advances in medicine (e.g., ultrasound), the safety of the D & X procedure nonetheless remains untested and undocumented. The only evidence suggesting that the D & X procedure is safe is an anecdotal report of a single surgeon, which has not been substantiated by other investigators nor even submitted to a peer-reviewed publication. In fact, the American Medical Association has taken a public stand against the procedure, supporting a federal ban on partial-birth abortions. On May 19, the AMA Board of Trustees issued a statement supporting then-pending federal legislation to outlaw the D & X procedure, stating that it "is a procedure which is never the only appropriate procedure and has no history in peer reviewed medical literature or in accepted medical practice development." This position later received the endorsement of the entire AMA House of Delegates. See 40 American Medical News, No. 25 (July 7, 1997).
 
 
 126
 The majority concludes in the alternative that the statute is unconstitutionally vague in that it would also effectively ban the more commonly used dilation and evacuation ("D & E") procedure. I do not believe this is so. Rather, I believe that the plaintiffs are attempting to create ambiguity where there is none. Such is the genius of a vagueness challenge because, in the extreme, words can always be said to be ambiguous. See, e.g., Frederick Schauer, Easy Cases, 58 S. Cal. L.Rev. 399, 420 (1985) ("Ever since Macbeth mistakenly relied on the linguistic precision of the witches' prophesy, people have been able to construct weird and fanciful instances in which even the clearest language breaks down.").
 
 
 127
 Plaintiffs seemed to concede at oral argument that had a different set of words been used in defining the D & X procedure the provision would have had identical effect, but been more difficult to challenge. Counsel, however, could not be pinned down as to any set of words that would, in his view, acceptably define the procedure. I believe this is because any set of words chosen by the Ohio legislature would have been challenged on vagueness grounds. But this type of argument (especially where, as here, the words chosen clearly define a procedure understood by doctors and laymen alike) proves too much.[2]
 
 
 128
 I believe that the definition of the D & X procedure makes clear the procedure subject to the ban. Only a procedure in which a physician terminates the pregnancy by "purposely inserting a suction device into the skull of a fetus to remove the brain" is banned by House Bill 135. And there is nothing from the legislative history to suggest that the legislators were attempting to deceive the electorate, the medical community, or the courts by wording the legislation in such a way as covertly to ban most second-trimester abortions through the effective ban of the commonly used D & E procedure. Rather, it appears that the Ohio legislature intended to only ban this one procedure because it believed it to be a particularly heinous method of abortion.
 
 
 129
 Although the legislature might have been wise to choose language more closely resembling the federal legislation, which is discussed by the majority at footnote 8 of its opinion,[3] I believe the language chosen by the Ohio legislature sufficiently defines the procedure to give fair notice as to what is encompassed by the ban. The testimony at the hearing in the district court clearly demonstrates that doctors who perform abortions have no difficulty discerning the conduct prohibited by the statute. Moreover, I believe the D & E procedure does not satisfy the definition of the ban because it does not terminate the pregnancy by purposely inserting a suction device into the fetal skull to excavate the contents of the skull. Rather, any suctioning of the brain is only a byproduct of the abortion procedure already performed, and is neither purposeful nor the means of terminating the pregnancy.
 
 
 130
 I am, however, in agreement with the majority's conclusion that the post-viability ban on the D & X procedure causes no constitutional violation. I find the severability issue moot, since, unlike the majority, I believe that the pre-viability ban on the D & X procedure causes no constitutional problem.
 
 II
 
 131
 I also part company with the majority's holding that the "medical necessity" and "medical emergency" provisions are unconstitutional for their lack of a scienter requirement. I believe that the language the Ohio legislature used "provides an adequate warning as to what conduct falls under its ban, and marks boundaries sufficiently distinct for judges and juries fairly to administer the law in accordance with the will [of the legislature]. That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense." United States v. Petrillo, 332 U.S. 1, 7, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877 (1947) (citation omitted). "The mere fact that a penal statute is so framed as to require a jury upon occasion to determine a question of reasonableness is not sufficient to make it too vague to afford a practical guide to permissible conduct." United States v. Ragen, 314 U.S. 513, 523, 62 S.Ct. 374, 378, 86 L.Ed. 383 (1942). What the majority's argument fails to recognize is that a defendant subject to criminal liability is afforded considerable constitutional protections, including the requirement that the state prove guilt "beyond a reasonable doubt." In a close case, the "beyond a reasonable doubt" standard would provide protection against the abuses hypothesized by the majority.
 
 
 132
 Moreover, I believe that the majority's reliance on Colautti v. Franklin, 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979), for the proposition that a statute without a scienter requirement is vague is misplaced. The Supreme Court in Colautti specifically declined to decide whether "under a properly drafted statute, a finding of bad faith or some other type of scienter would be required before a physician could be held criminally responsible for an erroneous determination of viability." 439 U.S. at 396, 99 S.Ct. at 686. Rather, the principle invoked by the Court in Colautti simply is that a scienter requirement can mitigate the vagueness of an otherwise vague law--not that the absence of a scienter requirement will "create" vagueness where it does not otherwise exists. See also Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498-99, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). And I do not believe there is anything vague, or even novel, about a statute prescribing a standard including components of good faith and reasonableness. For example, when a defendant raises a claim of self defense, he must show an honest belief that the imminent use of deadly force was necessary and that such belief was reasonable under the circumstances. See, e.g., Thomas v. Arn, 704 F.2d 865, 869 n. 5 (6th Cir.1983).
 
 
 133
 Even the three-Justice plurality in Casey recognized that the "life or health of the mother" exception may be invoked only when necessary "in appropriate medical judgment." See 505 U.S. at 879, 112 S.Ct. at 2821-22. It is difficult to see how a medical judgment can be deemed "appropriate" if it is, beyond a reasonable doubt, not a reasonable medical judgment. The majority's position would in essence constitutionalize a rule comparable to that adopted by the Supreme Court in Cheek v. United States, 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991), for tax cases. In that case, the Court interpreted the tax code to permit a taxpayer to defend against a charge that he willfully failed to pay taxes where he believed, in good faith, that he owed no taxes, even though his belief may have been unreasonable. See id. at 201-02, 111 S.Ct. at 610-11. I do not think the Constitution requires us to create a Cheek-like rule and hold that a doctor is exempt from liability simply because he believes, in good faith, that any childbirth not consented to by the mother will seriously damage her health.
 
 
 134
 Moreover, I am not persuaded by the majority's language that the lack of scienter is particularly troublesome in the abortion context because of the emotionally charged nature of the subject. See supra at 208-09. Such an argument fails to recognize what the law itself does recognize: that a jury will have to find beyond a reasonable doubt that the doctor failed to act "in good faith [or] in the exercise of reasonable medical judgment" when determining whether a medical emergency existed or whether there was a medical necessity for the abortion. Unlike the majority, I have faith that the jury system will not run amok. "If the jury system is to remain a part of our system of jurisprudence, the courts and litigants must have faith in the inherent honesty of our citizens in performing their duty as jurors...." State v. Sheppard, 165 Ohio St. 293, 135 N.E.2d 340, 343 (1956).
 
 
 135
 Moreover, even were I to accept the majority's view that the jury system may fail in the abortion context, I do not believe that simply changing the standard by which the physician is to be judged will cure the problem. If a jury and judge are bent on convicting a physician who performs late-term abortions because of distaste for the act, they will do so, no matter what standard is set out for them to follow. Determining whether a jury's verdict is supported by the evidence is our task as appellate judges--and, I should think, a task preferable to taking the question out of the hands of juries before they have had a chance to serve their constitutional function.
 
 III
 
 136
 Finally, I believe that to the extent Casey requires a medical necessity exemption that includes a mental-health component, see 505 U.S. at 879, 112 S.Ct. at 2821-22, the language in Casey incorporated by the Ohio legislature is sufficiently broad to encompass such a requirement.[4] Although the Supreme Court in Casey deferred to the Pennsylvania appellate court's construction of the medical emergency provision, which was specifically limited to physical conditions, the definition in Casey, which the Ohio legislature chose to adopt, does not in my opinion exclude a "serious non-temporary" threat that encompasses "severe risks of mental and emotional harm," language of which the majority would apparently approve. See supra at 209. Such phraseology is nothing more than a rewording of the language already found in Casey. It is hard to distinguish the majority's preferred "severe non-temporary" construction from the "serious risk of substantial and irreversible" language found in House Bill 135 and in Casey. Likewise, sufficiently severe "mental and emotional harm" can be encompassed by "impairment of a major bodily function." Although Ohio Rev.Code Ann. § 2919.16(J) specifically mentions only the physical conditions, of "Pre-eclampsia ... Inevitable abortion ... Prematurely ruptured membrane ... Diabetes [and] Multiple sclerosis" in its definition of "a serious risk of the substantial and irreversible impairment of a major bodily function," this list is non-exhaustive, as the section specifically states that the valid emergency conditions are "not limited to" the list enumerated by the legislature. It is counterintuitive to say that sufficiently severe mental harm is not an impairment of a major bodily function; if anything, it could be seen as an impairment of the most significant bodily function. But again my colleagues reach to construe the statute in its least favorable constitutional light. If the majority is unwilling to follow Justice Brandeis's advice in Ashwander v. TVA, 297 U.S. 288, 341, 56 S.Ct. 466, 480, 80 L.Ed. 688 (1936) (Brandeis, J., concurring), that "courts must refrain from passing upon the constitutionality" of a statute "unless obliged to do so," at a minimum it would be prudent to wait for an authoritative statutory construction from an Ohio court. Cf. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).
 
 IV
 
 137
 My colleagues begin their opinion by holding that the rule stated in United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987), will no longer govern facial challenges to abortion statutes in this circuit. See supra at 193-96. In Salerno, the Supreme Court stated that facial challenges to the constitutionality of statutes (as distinct from challenges to particular applications of statutes) can only be sustained upon a showing that there is "no set of circumstances ... under which the [statute] would be valid." Salerno, 481 U.S. at 745, 107 S.Ct. at 2100. Relying on language in Casey (itself a facial challenge) in which the three-Justice plurality noted that "in a large fraction of the cases in which [the statute] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion," 505 U.S. at 895, 112 S.Ct. at 2866, three federal appellate courts have held that Salerno has been effectively overruled and that facial challenges to abortion statutes need only demonstrate that a "large fraction" of statutory applications would be unconstitutional. See Jane L. v. Bangerter, 102 F.3d 1112, 1116 (10th Cir.1996), cert. denied sub nom. Leavitt v. Jane L., --- U.S. ----, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997); Planned Parenthood, Sioux Falls Clinic v. Miller, 63 F.3d 1452, 1456-58 (8th Cir.1995), cert. denied sub nom. Janklow v. Planned Parenthood, Sioux Falls Clinic, 517 U.S. 1174, 116 S.Ct. 1582, 134 L.Ed.2d 679 (1996); Casey v. Planned Parenthood of Southeastern Pennsylvania, 14 F.3d 848, 863 n. 21 (3d Cir.), stay denied, 510 U.S. 1309, 114 S.Ct. 909, 127 L.Ed.2d 352 (1994). On the other hand, one federal appellate court and four Justices of the Supreme Court have stated that Salerno remains the law in the abortion context as elsewhere. See Ada v. Guam Society of Obstetricians & Gynecologists, 506 U.S. 1011, 113 S.Ct. 633, 121 L.Ed.2d 564 (1992) (Scalia, J., joined by Rehnquist, C.J., and White, J., dissenting from denial of certiorari); Janklow v. Planned Parenthood, Sioux Falls Clinic, 517 U.S. 1174, ----, 116 S.Ct. 1582, 1584, 134 L.Ed.2d 679 (1996) (Scalia, J., joined by Rehnquist, C.J., and Thomas, J., dissenting from denial of certiorari); Barnes v. Moore, 970 F.2d 12, 14 n. 2 (5th Cir.), cert. denied, 506 U.S. 1021, 113 S.Ct. 656, 121 L.Ed.2d 582 (1992).
 
 
 138
 Because I believe that a proper construction of the Ohio statute at issue compels the conclusion that the statute is constitutional as a substantive matter, I see no reason for our circuit to wade into these cross-currents. Nonetheless, I note briefly a number of potential problems with my colleagues' resolution of the Salerno issue. First, the Salerno Court rested its holding on the long-recognized proposition that, except in the First Amendment context, facial challenges to statutes are disfavored. See Salerno, 481 U.S. at 745, 107 S.Ct. at 2100 ("The fact that [a statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment."). By taking the view that it is unconstitutional for a statute to chill the exercise of abortion rights--the fear of a chilling effect being the basis for the overbreadth doctrine--the majority today may unintentionally be taking the first step along a dangerous path along where, for example, FDA regulation of birth control devices could be subject to a facial challenge because they could chill the right of married couples to obtain and use contraceptive products. Many valid laws regulate conduct that, at the margins, comes close to the boundaries of constitutionally protected activity; only in the First Amendment context has this fact been declared to have constitutional significance.
 
 
 139
 Second, to the extent that Casey announced a rule to replace Salerno 's requirement of a showing that no possible application of a statute could be constitutional, the rule is that a plaintiff may possibly succeed on a facial challenge by showing that a "large fraction of the cases in which" the challenged statute is relevant are likely to involve statutory applications creating an undue burden on the right to choose abortion. That manifestly cannot be shown here. The district court found that 95 percent of abortions in the United States are performed in the first 15 weeks of pregnancy, a period in which the D & X procedure is not used. See Voinovich, 911 F.Supp. at 1064. For 95 percent of abortion seekers, therefore, neither the D & X prohibition nor the post-viability abortion prohibition are a problem. Even within the small subgroup of women who seek an abortion sufficiently late in pregnancy to prefer a D & X, the fact that there are other reasonably safe alternatives available in most cases means that the D & X prohibition cannot be said to impose an unconstitutional burden on their right to choose abortion, even though it eliminates one of their several options. The only women whose constitutional rights genuinely seem to be at issue, then, are those few women who seek late second-trimester abortions and for whom D & X is the only safe procedure. Putting aside the fact that the Ohio statute provides an affirmative defense for these women and their doctors, this small subset of women cannot seriously be called a "large fraction" of women affected by the statute. For these reasons, I would leave the question of Salerno 's applicability for another day.
 
 V
 
 140
 The deficiencies that the majority finds in the Ohio statute, and the changes that would apparently be necessary to remedy them in the majority's view, are matters of nuance, not of basic principle. If the views expressed by Judge Kennedy were accepted law, it seems to me that Ohio could change its language to meet this ruling and still accomplish, in my view, 99 (if not 100) percent of what it reasonably thought it was accomplishing with the words that it did use.
 
 
 141
 However, clear guidance to state legislatures as to where they permissibly can impose abortion regulations appears not to be the real motivation of plaintiffs nor the likely result of cases such as ours. The post-Casey history of abortion litigation in the lower courts is reminiscent of the classic recurring football drama of Charlie Brown and Lucy in the Peanuts comic strip. Lucy repeatedly assures Charlie Brown that he can kick the football, if only this time he gets it just right. Charlie Brown keeps trying, but Lucy never fails to pull the ball away at the last moment. Here, our court's judgment is that Ohio's legislators, like poor Charlie Brown, have fallen flat on their backs. I doubt that the lawyers and litigants will ever stop this game. Perhaps the Supreme Court will do so.
 
 VI
 
 142
 For the reasons discussed above, I would reverse the district court's order as it applies to the D & X provision, as well as to the medical necessity and medical emergency provisions.
 
 
 
 [1]
 Gestational age is calculated from the first day of the last menstrual period of the pregnant woman. OHIO REV.CODE ANN. § 2919.16(B)
 
 
 [2]
 The Act defines "medical emergency" as follows:
 [A] condition that a pregnant woman's physician determines, in good faith and in the exercise of reasonable medical judgment, so complicates the woman's pregnancy as to necessitate the immediate performance or inducement of an abortion in order to prevent the death of the pregnant woman or to avoid a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman that delay in the performance or inducement of the abortion would create.
 Id. § 2919.16(F). "Serious risk of the substantial and irreversible impairment of a major bodily function" means
 any medically diagnosed condition that so complicates the pregnancy of the woman as to directly or indirectly cause the substantial and irreversible impairment of a major bodily function, including, but not limited to, the following conditions:
 (1) Pre-eclampsia;
 (2) Inevitable abortion;
 (3) Prematurely ruptured membrane;
 (4) Diabetes;
 (5) Multiple sclerosis.
 Id. § 2919.16(J).
 
 
 [3]
 Appellants argued below that plaintiff Haskell lacks standing to challenge the post-viability provisions, because he only performs the D & X procedure up through the twenty-fourth week of pregnancy. The District Court held that plaintiff Haskell does have standing. See Women's Med. Prof'l Corp. v. Voinovich, 911 F.Supp. 1051, 1058-59 (S.D.Ohio 1995). The Court reasoned that the ban on post-viability abortions imposes a rebuttable presumption of viability at twenty-four weeks, OHIO REV.CODE ANN. § 2919.17(c), and that if plaintiff Haskell is unable to rebut that presumption in some cases, the remaining post-viability regulations will apply to him. Additionally, plaintiff Haskell will have to satisfy the viability testing requirement for any patients he treats who are in or beyond their twenty-second week of pregnancy. Appellants do not appeal this ruling
 
 
 [4]
 While only three justices joined in the portion of the opinion in which this language is quoted, the separate opinions of two additional justices reaffirmed Roe
 
 
 [5]
 As mentioned earlier, the one court since Casey that considered a facial challenge to a state law regulating post-viability abortions construed that law as a pre-viability measure and consequently applied Casey 's undue burden standard. See Jane L. v. Bangerter, 102 F.3d 1112, 1115-16 (10th Cir.1996), cert. denied sub nom. Leavitt v. Jane L., --- U.S. ----, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997)
 
 
 [6]
 The General Assembly declared that its interest in enacting the D & X ban is to "prevent[ ] unnecessary cruelty to the human fetus." H. 135, § 3, 121st Gen. Ass. (Ohio 1995)
 
 
 [7]
 Although the Act suggests that these are different methods of abortion, the terms are actually used interchangeably to describe the same procedure. See Joint Appendix at 607 (testimony of Dr. John Doe Number One), 689 (testimony of George Goler, M.D.); see also Brief of Amici Curiae American College of Obstetricians and Gynecologists, National Abortion Federation, American Civil Liberties Union, and American Civil Liberties Union of Ohio Foundation, Inc., In Support of Plaintiffs-Appellees at 6, 18 n.11
 
 
 [8]
 We draw our understanding of the D & X procedure from a paper presented by plaintiff Haskell at the National Abortion Federation Risk Management Seminar in 1992. See Joint Appendix at 221-28
 
 
 [9]
 We note that the proposed federal legislation prohibiting the performance of "partial-birth" abortions appears to come closer to describing the D & X procedure by defining a "partial-birth" abortion as "an abortion in which the person performing the abortion partially vaginally delivers a living fetus before killing the fetus and completing the delivery." Partial-Birth Abortion Ban Act of 1997, H.R. 1122, 105th Cong., 1st Sess. (1997). We express no opinion on the constitutionality of this definition or the federal legislation
 
 
 [10]
 In fact, since the Act bans "attempts" to perform the D & X procedure, i.e. attempts to terminate a pregnancy by purposely inserting a suction device into the skull of a fetus to remove the brain, the Act further implicates the D & E procedure, since the record shows that in performing a D & E procedure, many physicians try to insert a suction device into the skull in order to remove its contents and achieve compression, but they are not always successful
 
 
 [11]
 As we have already indicated, suction curettage and suction aspiration are used interchangeably to describe the same procedure. See supra note 7
 
 
 [12]
 The D & E procedure is difficult to perform at twenty weeks and beyond because the toughness of the fetal tissue makes dismemberment difficult. See Joint Appendix at 222. Therefore, physicians typically use the induction method to perform a later second trimester abortion. Essentially, an induction method of abortion entails inducing labor, resulting in the eventual expulsion of the fetus from the woman's uterus
 
 
 [13]
 The abortion statute in Simopoulos v. Virginia, 462 U.S. 506, 510, 103 S.Ct. 2532, 2535-36, 76 L.Ed.2d 755 (1983), relied upon by the dissent on page 213, differs from the statute here in that that statute shifted the burden of proof to the state after the doctor raised the affirmative defense. Here the burden remains on the defendant to prove the defense. The state need only prove that some other available abortion procedure would not pose a greater risk to the health of the pregnant woman than the risk posed by the D & X procedure performed or attempted to be performed by the doctor charged. Whether the doctor knew of the alternative method or was trained to perform it or reasonably believed it posed a greater risk would not avail the doctor
 
 
 [14]
 We note that striking down the entire D & X ban on the ground that it poses an undue burden would be consistent with Casey, in which the plurality analyzed provisions with application before viability under the undue burden standard even though those provisions were not specifically limited to pre-viability abortions while two additional justices would apply a broader standard. See Casey, 505 U.S. at 879-901, 112 S.Ct. at 2821-33
 
 
 [15]
 See footnote 4
 
 
 [16]
 Appellants argue that reasonableness is an adequate standard, quoting the following from Ragen, 314 U.S. at 523, 62 S.Ct. at 378: "The mere fact that a penal statute is so framed as to require a jury upon occasion to determine a question of reasonableness is not sufficient to make it too vague to afford a practical guide to permissible conduct." However, the Ragen Court found that scienter was an essential element of the offense involved and that therefore "[o]n no construction can the statutory provisions here involved become a trap for those who act in good faith." Id. at 524, 62 S.Ct. at 379
 
 
 [17]
 The District Court concluded that Ohio courts would not import a scienter requirement into the Act. See 911 F.Supp. at 1085-87. Appellants do not dispute this finding on appeal
 
 
 [18]
 Appellants argue that a chill analysis in the post-viability context is inappropriate. We disagree. As we have already suggested, see supra part II.B.2, a chill effect in the post-viability context has significant constitutional implications because of a woman's predominant right to protect her life and health. Additionally, general standards governing vagueness challenges suggest that a statute with vagueness problems that could chill constitutional freedoms should be held unconstitutionally vague. See Colautti, 439 U.S. at 391, 99 S.Ct. at 683; Springfield Armory, Inc. v. City of Columbus, 29 F.3d 250, 251-52 (6th Cir.1994). Since we have already held that Salerno does not apply in the abortion context, it is enough that the statute may be unconstitutionally applied to a large fraction of women for whom the law is relevant, namely those who have a medical need for a post-viability abortion
 
 
 [19]
 The Pennsylvania statute defined "medical emergency" as:
 That condition which, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate termination of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function.
 Casey, 505 U.S. at 879, 112 S.Ct. at 2822 (quoting 18 PA. CONS.STAT. § 3203 (1990)).
 
 
 [20]
 In A Woman's Choice-East Side Women's Clinic v. Newman, 904 F.Supp. 1434, 1466-74 (S.D.Ind.1995), a federal district court considered the constitutionality of an Indiana statute that allowed abortions where, inter alia, a delay would create "serious risk of substantial and irreversible impairments of a major bodily function," IND.CODE. ANN. § 16-18-2-223.5 (West Supp.1996). The court found that the plaintiffs had a reasonable likelihood of prevailing on the merits of their claim that the medical emergency exception was unconstitutionally narrow, in part because the reference to "major bodily function" appeared to exclude consideration of a woman's mental and emotional health. See id. at 1467-68. The court granted a preliminary injunction, but it also decided to certify a number of questions of statutory construction to the Supreme Court of Indiana, including the following: "Does the [medical emergency] definition except a woman from compliance with [the law's mandatory disclosure and waiting period requirements] when such compliance threatens to cause severe psychological harm to the woman?" See A Woman's Choice-East Side Women's Clinic v. Newman, 671 N.E.2d 104 (Ind.1996). The state court answered "yes," noting that this exception would not apply to temporary, psychological harms because the court also held in the case that the statute did not apply to other "severe-but-temporary" medical conditions. Id. at 111. The court further explained that the statute's "bodily function" language encompassed mental health, because "[m]ental processes are done by the brain, of course, and the brain is an organ, so mental processes are bodily functions even though they are not mechanical or chemical." Id. Here, the there is no question that the Act's definition applies only to physical health conditions, since the Ohio legislature intended the Act's definition to have the same scope as the definition at issue in Casey
 
 
 [1]
 I do not take issue with the conclusions expressed in Part II.E of the majority opinion
 
 
 [2]
 Allowing such an argument to succeed would, if taken to the extreme, result in all laws being vague. Many perfectly valid criminal laws are less than perfectly specific--hence the rule of lenity, which states that ambiguities in criminal statutes are to be construed in favor of the accused. United States v. R.L.C., 503 U.S. 291, 305-13, 112 S.Ct. 1329, 1338-42, 117 L.Ed.2d 559 (1992) (discussing rule of lenity)
 
 
 [3]
 As explained above, I am confident that any language in this area, no matter how clear, will be challenged on vagueness grounds inasmuch as all language is potentially ambiguous. Plaintiffs in a challenge to Michigan legislation banning partial-birth abortions argued that the language in that statute, which mirrors the federal legislation language, is unconstitutionally vague because the statutory language does not provide physicians with adequate clear notice of the specific procedure or procedures proscribed by the law. A federal district court recently found that language unconstitutionally vague, noting that the term "partially vaginally delivers a living fetus" covers "the partial removal of a fetus while its heart is still beating, whether in whole or in part, [and thus] could outlaw conventional dilation and evacuation procedures in which the fetus is evacuated part by part, as well as intact D & E procedures." Evans v. Kelley, 977 F.Supp. 1283, 1306 (E.D.Mich.1997)
 
 
 [4]
 I say "to the extent" because the part of Casey in which the vitality of Roe and Doe (the cases relied upon by the majority, see supra at 207-09) is discussed drew the votes of only three Justices. See Casey, 505 U.S. at 869-79, 112 S.Ct. at 2816-22